IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
Submitted on Briefs July 9, 2008

**WILLIE GERMAN, WILLIAM W. LENTS, ROBERT PINNER,
DARRELL SELLS, DEANA SELLS, and DARRON SELLS**
**v.**
**JOHN FORD, KENT FORD, BILLY WALKER,
and DYER INVESTMENT COMPANY, LLC.**

**Appeal from the Chancery Court for Dyer County**
**No. 04C60     James F. Butler, Chancellor**

_____

**No. W2007-02768-COA-R3-CV - Filed March 10, 2009**

_____

This appeal involves a contract dispute arising out of the Lennox Lewis/Mike Tyson prize fight in Memphis, Tennessee. The defendant/appellee investment firm agreed to provide financing to guarantee minimum ticket sales for the prize fight. If ticket sales for the fight were below the minimum requirement, the investment firm would pay the difference, but if ticket sales exceeded the minimum, the investment firm would profit. The investment firm solicited the plaintiff/appellant sub-investor and other sub-investors to provide back-up financing, so that the investment firm would not bear the entire risk of loss in the event that minimum ticket sales were not met. The plaintiff sub-investor would also participate in the profits if ticket sales exceeded the minimum. Under the alleged agreement between the investment firm and the sub-investor, the sub-investor was to post a letter of credit in order to obtain his interest in the potential profits and liabilities. As the ticket sales were ongoing, the plaintiff sub-investor arranged for the required letter of credit to be issued, but needed information from the investment firm in order to get it issued. The investment firm did not provide the information to the sub-investor. Meanwhile, the ongoing ticket sales reached (and ultimately exceeded) the minimum requirement. At that point, the investment firm no longer faced a risk of loss and told the plaintiff sub-investor that it no longer needed sub-investors and would not go through with the agreement. The sub-investor never posted a letter of credit and the investment firm did not pay the sub-investor a percentage of the profits. The sub-investor then filed the instant lawsuit against the investment firm, alleging, *inter alia*, breach of contract and breach of the covenant of good faith and fair dealing. The defendant investment firm filed a motion for summary judgment. The trial court found that there was no enforceable contract because the sub-investor never posted the letter of credit, and dismissed the claims for breach of the covenant of good faith and fair dealing because they were derivative of the breach of contract claim. Accordingly, the trial court granted the investment firm's motion for summary judgment. The sub-investor now appeals. We reverse the trial court's holding that there was no enforceable contract between the investment firm and the sub-investor, finding that the investment firm had an implied duty to cooperate in the sub-investor's performance of its contractual promise. Finding an enforceable contract, we also

reverse the trial court's dismissal of the claims for breach of the covenant of good faith and fair dealing.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court is Reversed in Part, Affirmed in Part, and Remanded**

HOLLY M. KIRBY, J., delivered the opinion of the Court, in which ALAN E. HIGHERS, P.J., W.S., and DAVID R. FARMER, J., joined.

Kenneth S. Williams and Craig D. Madewell, Cookeville, Tennessee, for the Plaintiff/Appellant, William W. Lents

S. Leo Arnold, Dyersburg, Tennessee, for the Defendant/Appellee, Dyer Investment Company, LLC

**OPINION**

**FACTS AND PROCEDURAL HISTORY**

In early 2002, Dyersburg attorney Charles Kelly ("Kelly") met with Michael W. Lampley ("Lampley"), a member of Prize Fight Promotions, LLC ("Prize Fight"), to discuss Prize Fight obtaining financing to co-promote a major prize fight to be held in Memphis, Tennessee on June 8, 2002 at the Pyramid Arena between the then-heavy weight champion Lennox Lewis and controversial former heavy weight champion Mike Tyson.[1] In order to win the right to promote the event, Prize Fight had to obtain financial commitments to back a $12,500,000 "site fee," that is, guaranteed minimum ticket sales, to pay the fighters for their participation. In exchange, Prize Fight would receive promotional rights to the Lewis/Tyson Fight, including ticket sales, advertising, and other income generated by the promoters.

Lampley asked Kelly to help Prize Fight obtain investors to guarantee the $12,500,000 site fee.[2] As described to Kelly, if ticket sales and subscriptions exceeded $12,500,000, then the

---

[1] The Lewis/Tyson fight was originally scheduled for April 2002 in Las Vegas, Nevada. However, a January 2002 press conference held in New York to promote the fight turned into a fracas in which Tyson attacked Lewis and bit him on the leg. As a result, the Nevada State Athletic Commission refused a boxing license to Tyson, leaving the anticipated fight without a venue. After organizers guaranteed the site fee, the fight was scheduled for June 8, 2002 at the Pyramid Arena in Memphis and was dubbed the "Rumble on the River." *See* BBC Sport, *Lewis-Tyson to Fight in Memphis*, Mar. 26, 2002, http://news.bbc.co.uk/sport/; *Tyson Brawl Sparks $56m Lawsuit,* Aug. 3, 2002, http://news.bbc.co.uk/sport/; and *Lewis Wins Rumble on the River*, June 9, 2002, http://news.bbc.co.uk/sport/. Although ticket sales were initially slow, the fight ultimately proved to be financially successful. *See* BBC Sport, *Big Fight Facing Big Turn-Off*, June 3, 2002, http://news.bbc.co.uk/sport/; and *Muddy Marvellous in Memphis,* June 6, 2002, http://news.bbc.co.uk/sport/. Lewis defeated Tyson decisively in the eighth round. *See* BBC Sport, *Lewis Stuns Tyson for Famous Win*, June 9, 2002, http://news.bbc.co.uk/sport/.

[2] Because our standard of review requires that we view the facts in a light most favorable to the non-moving party, Lents, we outline the facts as alleged by Lents, relying in part on the affidavit of Charles Kelly. *See Stovall v.*
(continued...)

guarantors would make a profit, but if ticket sales and subscriptions totaled less than $12,500,000, then the guarantors would pay the difference in proportion to their guaranteed amount.

Armed with this proposal, Kelly met with Billy Walker ("Walker") of Dyer Investment Company, LLC ("Dyer Investment") to discuss the possibility of Dyer Investment guaranteeing a portion of the $12,500,000 site fee. A few days later, Walker told Kelly that Dyer Investment wanted to guarantee the entire $12,500,000 site fee. However, Dyer Investment wanted to secure back-up investors to share the risk of loss in the event that ticket sales and subscriptions ended up totaling less than the $12,500,000 minimum. The goal was to secure commitments from back-up investors who would agree to provide letters of credit in favor of Dyer Investment in increments of $500,000 or $1,000,000. If ticket sales and subscriptions ended up totaling less than $12,500,000, then each back-up investor would pay Dyer Investment the difference between the total ticket sales and subscriptions and the $12,500,000 minimum, in proportion to the risk he assumed. If on the other hand ticket sales and subscriptions exceeded $12,500,000, then the back-up investors would receive a proportionate percentage of the profits. Walker asked Kelly to help Dyer Investment get enough back-up investors to virtually eliminate Dyer Investment's risk of loss.

In mid-March 2002, one of Dyer Investment's attorneys drafted a form document called an "Investor Participation Agreement" ("IPA") that was to be the agreement between Dyer Investment and the back-up investors. Kelly then took the IPA to meetings with several potential back-up investors, including Plaintiff/Appellant William W. Lents ("Lents"), to explain how the deal would work.[3] At around this time, ticket sales and subscriptions for the fight got underway.

At the time that Walker met with Kelly about the back-up investors, First Tennessee Bank had agreed to issue Dyer Investment's primary letter of credit guaranteeing the site fee. At some point thereafter, First Tennessee informed Walker that it had decided not to issue the letter of credit after all. As Dyer Investment sought alternate financing, Kelly continued to meet with potential back-up investors, including Lents.

The first IPA Lents signed was dated March 21, 2002. The IPA, executed by Dyer Investment as "Lead Investor" and by Lents as "Participant," noted that Prize Fight expected to acquire the right to co-promote the Lewis/Tyson fight in Memphis on June 8, 2002, and that in connection with the fight, Prize Fight was required to obtain financial commitments to guarantee a site fee in the amount of $12,500,000. The IPA stated that Dyer Investment had the exclusive right to arrange financing for the guaranteed site fee, and had committed to obtain irrevocable standby letters of credit to support the guaranteed site fee. It outlined the arrangement between Prize Fight

---

[2](...continued)
*Clarke*, 113 S.W.3d 715, 721 (Tenn. 2003) (citation omitted). Dyer Investment disputes many of the assertions made by Kelly and Lents.

[3]Walker claimed that he gave Kelly pre-signed IPAs to be signed by the back-up investors whom Kelly solicited, and that he never saw IPAs signed by back-up investors until the instant lawsuit was initiated. Kelly maintained that he brought Walker IPAs that had been signed by back-up investors, and that Walker executed the IPAs after the back-up investors had signed them.

and Dyer Investment under which the first $12,500,000 of the net ticket sales would be paid to Dyer Investment as reimbursement for the guaranteed site fee, and any remaining ticket proceeds would be allocated between Prize Fight and Dyer Investment. It stated that Dyer Investment desired to assign certain of its rights to such proceeds "in consideration for certain credit assurances or backup letters of credit to be provided in favor of" Dyer Investment in the event that the net ticket sales totaled less than the guaranteed site fee.

In the March 21, 2002 IPA, Lents filled in the blanks for the amount on the form document, agreeing to guarantee $1,000,000 of the total $12,500,000 in exchange for the opportunity to receive a ten percent return on his assumed risk. The IPA provided in part:

> 1. <u>Purchase of Participation Interest</u>. Upon the execution of this Agreement, [Lents] shall post an irrevocable standby letter of credit in an amount equal to <u>One Million</u> and no/100 Dollars (<u>$1,000,000</u>) issued from a financial institution or bank acceptable to [Dyer Investment] in favor of [Dyer Investment] as beneficiary thereunder (the "Participant Letter of Credit"). Upon the delivery of the Participant Letter of Credit (the terms and expiry to be acceptable to [Dyer Investment] in its sole discretion) to [Dyer Investment], [Lents] shall acquire a percentage interest in [Dyer Investment's] rights with respect to the Lead Investor Fee, as more specifically set forth in Section 9 of this Agreement, and a percentage interest in [Dyer Investment's] liabilities with respect to [Dyer Investment's] Letter of Credit, as more specifically set forth in Section 8 of this Agreement.

The IPA provided that Dyer Investment "represents and warrants" that "this Agreement is the legal, valid, and binding obligation of [Dyer Investment] enforceable against [Dyer Investment] in accordance with its terms" and contained a similar provision as to Lents. It stated that Dyer Investment was authorized to draw on Lents' letter of credit, once the anticipated fight occurred and Dyer Investment presented to the issuing bank a letter stating that the ticket sales had ended up totaling less than the guaranteed site fee, and specified the amount to be drawn against Lents' letter of credit. The IPA did not set forth deadlines for the parties' obligations, but stated, "Time is of the essence in this Agreement."

Kelly continued to solicit commitments from back-up investors. Ticket sales for the fight continued as well. At some point in late March or early April, Lents asked Kelly if he could guarantee another $1,000,000, this time using a personal guaranty rather than a letter of credit from a financial institution. Lents executed an IPA with the letter of credit language stricken, but this was deemed unacceptable. Thereafter, Lents executed another IPA, guaranteeing an additional $1,000,000 by way of a letter of credit to be issued by his bank, raising Lents' total obligation to $2,000,000 in guaranties.

According to Kelly, Lents and the other back-up investors who signed the IPAs began asking him for information to give to their banks in order to get the letters of credit issued. The information included "the form letter of credit, where and when these were to be sent, who the letters were to be payable to, and things of that nature." Kelly claimed that he spoke to Walker about getting the final form letter of credit for the back-up investors' banks, and that Walker repeatedly promised that the information would soon be forthcoming. Kelly was admonished by Walker to tell back-up investors

"to be ready to have the letters issued very quickly." He relayed this information to the back-up investors.

Kelly said that the original plan was to make the back-up letters of credit payable to Dyer Investment, but claimed that Walker told him that, because First Tennessee Bank was no longer willing to issue Dyer Investment's primary letter of credit, the other financial institutions from which Dyer Investment was seeking financing might require that the back-up letters of credit be made payable to an entity other than Dyer Investment. During this time, Kelly said, the back-up investors were "waiting for me to give them the proper letter of credit form including to who[m] it was to be paid, and I was waiting for Walker to give [the information] to me." As to Lents, Kelly said, after Lents had requested the information for the letter of credit "a number of times," Kelly got "a sample form letter of credit from Walker and sent it to Lents to show to his bank." However, Walker cautioned Kelly to tell back-up investors, including Lents, that the form letter of credit was "not final and not to . . . use it." Lents gave Kelly commitment letters from his bank showing that the bank "was in a position to provide letters of credit for $2,000,000.00 on [Lents'] behalf." Kelly claimed:

> The only thing holding up the issuance of those letters of credit [as to Lents] was the need to provide the bank the form letter of credit including who it was to be made payable to, but Walker would not provide this information to me and so I could not provide [it] to Lents for his bank. . . . Walker . . . never provided me the information needed for [the back-up investors] to obtain the needed letters of credit.

Meanwhile, Kelly said, tickets for the Lewis/Tyson Fight were steadily being sold. Each ticket sold reduced the amount that Dyer Investment had to guarantee and its commensurate risk of loss. On April 5, 2002, reflecting this reduced risk, Dyer Investment got a commitment from First Citizens National Bank ("First Citizens") to issue a letter of credit on behalf of Dyer Investment in the amount of $6,500,000. By April 15, 2002, that amount was reduced to $5,000,000. On April 18, 2002, First Citizens issued an irrevocable standby letter of credit on behalf of Dyer Investment in favor of Showtime Networks, Inc. in the amount of $1,500,000, reflecting Dyer Investment's reduced risk of loss at that time. During this time, Kelly said, he and Walker spoke regularly about the back-up investors and their guaranties.

Soon thereafter, Kelly said,

> fight ticket sales and subscriptions exceeded $12,500,000.00 so that Dyer Investment no longer had any risk of loss. At or around that time Walker advised me that Dyer Investment no longer needed the underlying [back-up] investor guarantees. I asked him what he was going to do about paying the back up investors the amounts under their contracts and he stated, "f– – – them."

On June 8, 2002, the Lewis/Tyson Fight was held as scheduled. Dyer Investment made approximately $3,000,000 from its guaranty of ticket sales. Dyer Investment refused to pay any portion of this money to the back-up investors, denying that it was under any obligation to do so.

On February 6, 2004, Plaintiff back-up investors Willie German, Robert Pinner, Darrell Sells, Deana Sells, Darron Sells, and Plaintiff/Appellant Lents filed the instant lawsuit in the Chancery Court of Dyer County against Defendants John Ford ("J. Ford"), Kent Ford ("K. Ford"), Walker, and Defendant/Appellee Dyer Investment. The complaint included claims relating to breach of contract, inducing breach of contract, civil conspiracy, fraud, and tort arising out of the agreements to serve as back-up investors for the Lewis/Tyson Fight. The back-up investors sought compensatory damages, treble damages for the claims for inducement of breach of contract, punitive damages for tort and civil conspiracy, and attorneys' fees.

On March 8, 2004, the Defendants filed a motion to dismiss for failure to state a claim upon which relief can be granted. Tenn. R. Civ. P. 12.02(6). On November 12, 2004, the trial court entered a consent order dismissing with prejudice the Plaintiffs' claims for breach of contract and attorney's fees against J. Ford, K. Ford, and Walker, and members of Dyer Investment, and granted the Plaintiffs' motion to amend the complaint. On December 9, 2004, the trial court entered an order dismissing all of the remaining claims asserted by the Plaintiffs against the Defendants, except for the breach of contract claims and covenant of good faith and fair dealing claims asserted against Dyer Investment.

Plaintiffs Willie German, Robert Pinner, Darrell Sells, Deana Sells, and Darron Sells eventually settled with Dyer Investment, and on March 28, 2005, the trial court entered an order dismissing with prejudice their breach of contract claims against Dyer Investment. This left only Lents and Dyer Investment still involved in the litigation.

On May 23, 2005, Lents filed an amended complaint against Dyer Investment. In his complaint, Lents alleged that he was due $200,000 from the profits that Dyer Investment made on the Lewis/Tyson fight, pursuant to the IPAs executed by both Lents and Walker. Lents asserted that Dyer Investment breached its contracts with Lents by not paying Lents the $200,000 that it owed him, and by failing to provide Lents the information necessary to allow his bank to issue the letters of credit, thereby hindering and preventing Lents' performance under the IPAs. Lents alleged that Dyer Investment breached the covenant of good faith and fair dealing and that, to the extent that his claims sounded in tort, he was entitled to punitive damages because Dyer Investment's actions were undertaken with wrongful intent and/or reckless and callous indifference to Lents' rights.[4]

On August 14, 2007, Dyer Investment filed a motion for summary judgment.[5] In the motion, Dyer Investment argued that, by the terms of the IPAs, there were no enforceable contracts until Lents had the letters of credit issued. Because the letters of credit were never issued, the IPAs never became enforceable contracts. Dyer Investment's failure to provide Lents with the information necessary to have the letters of credit issued was not a breach of contract; rather, it only prevented Lents from accepting Dyer Investment's offer. Dyer Investment also asserted that the claim for breach of the implied covenant of good faith and fair dealing should be dismissed because (1) there

[4]Lents' amended complaint also included claims of negligent and/or intentional misrepresentation. These claims were later voluntarily dismissed and are not at issue in this appeal.

[5]Lents also filed a motion for partial summary judgment, which was later withdrawn.

is no duty of good faith and fair dealing in the absence of an enforceable contract, and (2) Dyer Investment's failure to provide Lents with the letter of credit information related to the execution of the contracts, and the duty of good faith and fair dealing relates to the performance of a contract, not its execution. Finally, Dyer Investment asserted that the claim for punitive damages should be dismissed because punitive damages may not be awarded for breach of contract even if the breach was intentional.

In a letter dated October 5, 2007, the trial court set forth its decision on the motion for summary judgment. The trial court found that, if there were enforceable contracts between Lents and Dyer Investment, there were disputed issues of fact that would preclude a grant of summary judgment. However, mirroring much of the reasoning advocated by Dyer Investment, it found that Dyer Investment was entitled to summary judgment.

In its lengthy letter, the trial court carefully analyzed "the four corners of the contract," that is, the IPA. It focused on the "Purchase of Participation Interest" clause excerpted above, terming it "the operative paragraph." Noting that the purpose of the Agreement was to permit Lents to acquire a percentage interest in Dyer Investment's right to earn a fee for financing the fight, the trial court observed:

> In order to acquire that percentage interest a key provision was the delivery of a letter of credit to Dyer on terms and expiry acceptable to Dyer in its sole discretion. There are many facts, disputed and undisputed, surrounding how that was to be done, and why it was not done. It is undisputed that it was not done. The terms of the letter of credit were never furnished by Dyer to Lents, or to anyone else for that matter.

Citing pertinent caselaw, the trial court stated that, to have an enforceable contract, the acceptance of the offer must be identical to the offer and unconditional, and there must be a meeting of the minds. Applying this principle to the IPA, the trial court stated:

> The document signed by Lents and Dyer does not have all of the essential terms. In order for it to be a mutual meeting of the minds, these terms must have been supplied and agreed upon. Dyer retained sole control over the terms of the line of credit letter. Nothing in the contract requires Dyer to furnish that information at any particular time to Lents. The most that can be said is the parties were dealing back and forth with a view toward ultimately entering into a binding agreement that would bind both parties. Lents' claim mainly pertains to Dyer's actions that prevented the contract from being formed and binding. Neither party ever entered into a contract which had all of the essential terms. Further, Lents could not become bound by the contract until it was a contract. It could not become a contract until Lents was able to furnish the letter of credit and deliver same to Dyer. The parties never got to that point where the parties could agree on what the participation interest of Lents would be. As the Plaintiff said in some of his pleadings, Dyer's exposure was reduced on almost a daily basis. While it might not be fair to Lents in holding him out there, waiting for the exposure to become more solid, the parties never

-7-

actually reached a mutual agreement as to what level of participation Lents would have.

Finding no binding agreement between Lents and Dyer Investment, the trial court held that summary judgment was appropriate on Lents' breach of contract claim.

With regard to the claims for the breach of the covenant of good faith and fair dealing, the trial court held that Dyer Investment was entitled to summary judgment for two reasons. First, a breach of the covenant of good faith and fair dealing is not a "stand alone" claim; it is not actionable if there is no underlying contract. Second, the trial court perceived that Lents' claim related to execution of the agreement, and observed that the covenant of good faith and fair dealing goes to the performance or enforcement of a contract, not its execution. Therefore, because there were no contracts between Lents and Dyer Investment and because Lents' claims related to the execution of the agreement, summary judgment in favor of Dyer Investment was proper. Finally, the trial court held that punitive damages are not available in a breach of contract action in Tennessee.

On November 9, 2007, the trial court entered an order dismissing with prejudice Lents' claims against Dyer Investment.[6] On November 30, 2007, Lents filed a timely notice of appeal.[7]

### ISSUES ON APPEAL AND STANDARD OF REVIEW

On appeal, Lents raises three issues:
1. Whether the trial court properly granted Dyer Investment's motion for summary judgment with respect to Lents' breach of contract claims, finding that there were no enforceable contracts between Dyer Investment and Lents.
2. Whether the trial court properly granted Dyer Investment's motion for summary judgment with respect to Lents' claims for breach of the implied covenant of good faith and fair dealing.
3. Whether the trial court made an error in fact in its ruling sufficient to have the case remanded to the trial court for a new hearing when the trial court stated that Lents did not lose any money on his deal with Dyer Investment.

[6]On the same date, the trial court also entered an "Order Re Motion For Entry Of Final Judgment As To Dismissed Claims," entered as a final judgment as to all claims dismissed by the trial court pursuant to its order of dismissal dated December 9, 2004.

[7]In his Notice of Appeal, Lents indicates that he appeals both orders of the trial court entered on November 9, 2007. In his brief, however, he addresses only the claims that were dismissed in the order granting Dyer Investment's motion for summary judgment. Therefore, any appeal by Lents of the issues arising under the "Order Re Motion For Entry Of Final Judgment As To Dismissed Claims" is waived. *See* Tenn. R. App. P. 27; *Bean v. Bean*, 40 S.W.3d 52, 55–56 (Tenn. Ct. App. 2000) (citations omitted); *Blair v. Badenhope*, 940 S.W.2d 575, 576–77 (Tenn. Ct. App. 1996) (citations omitted).

Since only questions of law are involved, there is no presumption of correctness regarding the trial court's grant of summary judgment. *See Bain v. Wells*, 936 S.W.2d 618, 622 (Tenn. 1997) (citation omitted). Therefore, our review is *de novo* on the record before this Court. *See Warren v. Estate of Kirk*, 954 S.W.2d 722, 723 (Tenn. 1997) (citation omitted). Summary judgment shall be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Tenn. R. Civ. P. 56.04.

The determination of whether a contract has been formed is a question of law. *Murray v. Tenn. Farmers Assurance Co.*, No. M2008-00115-COA-R3-CV, 2008 WL 3452410, at *2 (Tenn. Ct. App. Aug. 12, 2008) (citations omitted). The interpretation of a contract and the ascertainment of the parties' intentions relating to the contract are also questions of law. *Guiliano v. Cleo, Inc.*, 995 S.W.2d 88, 95 (Tenn. 1999) (citation omitted); *Doe v. HCA Health Services of Tenn., Inc.*, 46 S.W.3d 191, 196 (Tenn. 2001) (citation omitted). Therefore, the trial court's decisions relating to contract formation and its interpretation of the contract are not afforded a presumption of correctness. *See Angus v. W. Heritage Ins. Co.*, 48 S.W.3d 728, 730 (Tenn. Ct. App. 2000) (citations omitted).

## ANALYSIS

We consider first the issue of whether the IPAs are enforceable contracts. Lents argues that the IPAs were binding contracts from the time that they were signed by the parties. Lents characterizes the requirement that he post a letter of credit as a condition in the contract, rather than a requirement for the existence of an enforceable contract. He maintains that the exact date by which Dyer Investment was to provide the terms of the letter of credit could not be placed in the contract because, at the time that the agreement was signed, Dyer Investment had yet to obtain its primary financing. Lents argues that the language in the agreement shows that Dyer Investment would deliver the terms of the anticipated letter of credit to Lents once Dyer Investment arranged its financing, and that this duty on Dyer Investment's part was intended by the parties and implied in the contract.

Dyer Investment rejects the notion that the posting of the letter of credit by Lents is a condition contained within the contract. It insists that Lents' posting of the letter of credit is the operative act that would give rise to a contract in the first place. Dyer Investment argues that for Lents to have accepted the offer, he would have had to sign the IPA *and* post the letter of credit. Dyer Investment contends that the IPAs were not sufficiently definite to create an enforceable contract by the signatures of the parties. It maintains that nothing in the IPA requires it to provide the letter of credit information to Lents, and if for any reason Dyer Investment did not supply the letter of credit information, an enforceable contract between the parties could not be created.

In light of these arguments, we examine the IPA and the trial court's analysis in order to determine whether the IPA is an enforceable contract.

In the case at bar, the trial court found that the IPA signed by Lents and Dyer Investment constituted merely preliminary negotiations. It relied on the fact that Dyer Investment retained the

right to final approval of the standby letter of credit, in its sole discretion, and emphasized that "[n]othing in the contract require[d] Dyer to furnish that information [on the terms of the letter of credit] at any particular time to Lents." Thus, it concluded that the IPA lacked all of the essential terms, and was not a contract.

To determine whether the IPA constitutes preliminary negotiations or a contract, we look to the language used in the writing and the surrounding circumstances known to both parties. *See Gurley v. King*, 183 S.W.3d 30, 43 (Tenn. Ct. App. 2005) (citing *Bailey v. Brister*, 353 S.W.2d 564, 568 (Tenn. Ct. App. 1961)); 17A AM. JUR. 2D *Contracts* § 37 (2004). Here, the IPA sets out the surrounding circumstances in detail. It notes that Dyer Investment had taken on considerable risk by guaranteeing the $12,500,000 minimum ticket sales, in return for the right to any profits from sales over $12,500,000. It states that Dyer Investment sought to limit its risk by obtaining "irrevocable" letters of credit from standby investors, in return for giving up a portion of any profits earned. The language used to state Lents' obligation is clear and directive: "Upon the execution of this Agreement, [Lents] *shall* post an irrevocable standby letter of credit" (emphasis added) in favor of Dyer Investment in the specified amount, issued from a financial institution acceptable to Dyer Investment. From the mandatory language used, Lents agreed to post a letter of credit in the required amount. Had Dyer Investment furnished Lents with the information needed to post the letter of credit, the IPA states unequivocally that Lents was required to do so.

In this sense, the posting of a letter of credit is clearly a promise by Lents, rather than simply a condition. A condition "creates no right or duty in and of itself but is merely a limiting or modifying factor. . . . If the condition is not fulfilled, the right to enforce the contract does not come into existence." *Blitz v. Subklew*, 810 A.2d 841, 845 (Conn. App. Ct. 2002) (citations omitted). In contrast, a promise "raises a duty to perform and its breach subjects the promisor to liability and damages." *Charron v. United States*, 200 F.3d 785, 790–91 (Fed. Cir. 1999) (quoting *United States v. Schaeffer*, 319 F.2d 907, 911 (9th Cir. 1963)). Thus, had the effectiveness of the IPA been premised on whether Lennox Lewis and Mike Tyson reached an agreement to stage the fight in Memphis, this would have been a condition precedent over which the parties had no control, and Lents' obligation to produce the letter of credit would have been contingent upon its occurrence. Likewise, had the IPA stated that Lents "may" post a letter of credit in the specified amount in return for a chance to participate in any profits, then Lents would have made no promise to deliver a letter of credit and consequently would have had no duty to perform. As written, however, the IPA creates a duty on the part of Lents to post the letter of credit, and failing to do so would have subjected him to liability to Dyer Investment in the event that ticket sales for the fight had ended up below the required minimum. Thus, Lents had a binding obligation to post a letter of credit in the specified amount.

The IPA does not include a date by which Lents was required to post the letter of credit; rather, it states that his obligation to do so was immediate. The form IPA provides that Lents "shall" post the letter of credit "[u]pon the execution of this Agreement." It states expressly that "[t]ime is of the essence in this Agreement." The situation described in the preamble to the Agreement bears this out. As of the date of the first IPA, the prize fight was scheduled to take place in slightly more than two months. The IPA states that Dyer Investment had "committed" to post credit assurances to support the guaranteed site fee, and that it sought to assign a portion of its rights to the profits

from the fight in consideration for standby credit assurances from sub-investors such as Lents. The time imperative is apparent under these circumstances; if the time for the fight had drawn nigh and it had become clear that ticket sales would fall below the guaranteed minimum, the lack of upside potential would have removed any motivation for sub-investors to provide backup credit assurances. This would have left Dyer Investment bearing the entire loss. The lack of committed sub-investors may have also affected Dyer Investment's ability to arrange the primary financing. Consistent with the immediate need to get the financing in place, Kelly's affidavit states that Walker told Kelly to caution sub-investors such as Lents "to be ready to have the letters [of credit] issued very quickly."

Thus, from the language in the IPA and the surrounding circumstances, Lents had a binding obligation to provide Dyer Investment with a letter of credit in the agreed-upon amount very soon after the parties signed the document. Consistent with this obligation, the evidence in the record shows that Lents quickly made arrangements to obtain the necessary financing, asked Kelly repeatedly to obtain from Dyer Investment the information needed to have the letters of credit issued, and gave Kelly commitment letters from his bank showing that the bank was in a position to issue the letters credit in the required amounts.[8]

What, then, were Dyer Investment's obligations, if any, under the IPA? As noted by the trial court, if the parties did not reach agreement on all of the essential terms, the writing must be deemed preliminary negotiations and not a contract. However, lack of agreement on matters that are minor will not preclude a finding that the document is a contract. *See Gurley*, 183 S.W.3d at 36 (citation omitted); 17A AM. JUR. 2D *Contracts* § 40 (2004). Moreover, if the parties have executed a document that purports to be a contract, the court presumes that they intended "to make an effective, rather than a nugatory, agreement," and thus the document should be construed in such a way as to make the obligations imposed by it binding on both parties. 17A AM. JUR. 2D *Contracts* § 341 (2004); *see Scott v. McReynolds*, 255 S.W.2d 401, 405 (Tenn. Ct. App. 1952) (citations omitted). In addition, doubtful language is construed against the party who drafted the contract, especially where the drafting party seeks to use the language to defeat its operation. *See Ralph v. Pipkin*, 183 S.W.3d 362, 367 (Tenn. Ct. App. 2005); *see also* RESTATEMENT (SECOND) OF CONTRACTS § 206 (1981).

Here, the trial court emphasized that, under the IPA, Dyer Investment had "final approval in its sole discretion" regarding the terms of Lents' letter of credit. In order to obtain a percentage interest in any profits from the fight, Lents was required to give Dyer Investment a letter of credit from a financial institution that was acceptable to Dyer Investment and "on terms and expiry acceptable to Dyer in its sole discretion."

It is unclear whether the trial court found, in essence, that Dyer Investment's obligation as to approval of a letter of credit proffered by Lents was in effect illusory. A promise is illusory when it fails to bind the promisor, who retains the option of not performing; an illusory promise is not consideration for a return promise, and so cannot be the basis for finding a contract. *See Rode Oil*

_____

[8]The appellate record does not indicate any dispute as to whether Lents' actions in arranging for financing were timely.

-11-

***Co. v. Lamar Adver. Co.***, No. W2007-02017-COA-R3-CV, 2008 WL 4367300, at *10 (Tenn. Ct. App. Sept. 18, 2008) (citations omitted). A contractual obligation, however, is not illusory if the party's discretion must be exercised with reasonableness or good faith. 17A AM. JUR. 2D *Contracts* § 130 (2004); *see Rode Oil Co.*, 2008 WL 4367300, at *10. Almost invariably, a requirement of good faith is implied, requiring that the obligee's dissatisfaction with the obligor's performance exist in good faith and not be simulated to escape liability. *See Rode Oil Co.*, 2008 WL 4367300, at *10; JOSEPH M. PERILLO, CALAMARI AND PERILLO ON CONTRACTS § 11.37 (5th ed. 2003). Here, Dyer Investment had an obligation to exercise its discretion to approve the terms of Lents' proffered letter of credit in good faith. Moreover, because the subject matter of the approval provision would not involve matters of personal taste, such as a work of art, the preferred interpretation of the IPA would require Dyer Investment to exercise its discretion not only in good faith, but also in an objectively reasonable manner, that is, the court would have to determine whether a reasonable person in the position of Dyer Investment would have approved the letter of credit.[9] *See JM Partners/Omni Aviation v. Group Invs., Inc.*, 1988 WL 118099, at *2 (Tenn. Ct. App. Dec. 9, 1988) (holding that a provision in a lease providing that the term of the lease shall not commence until the lessee is "completely satisfied" with the equipment's condition was to be interpreted under an objective standard when the parties did not intend for the lessee to have "the unfettered right" to reject the equipment) (citing *Robeson & Weaver v. Ramsey*, 245 S.W. 413, 415 (Tenn. 1922) (noting that while there are conflicting decisions regarding whether to apply a subjective or an objective standard when the matter is one of utility rather than personal taste, many cases hold that performance is "sufficient if it reasonably ought to satisfy, or should be satisfactory to a reasonable man")). Regardless of whether a reasonableness standard would apply, Dyer Investment's obligation to exercise its discretion in good faith makes it not illusory and valid consideration for Lents' promised performance.[10] Thus, under the IPA, Dyer Investment had an obligation to determine, in good faith, whether Lents' proffered letter of credit met with its approval.

The IPA states that, upon delivery to Dyer Investment of an acceptable letter of credit, Lents *"shall acquire* a percentage interest" (emphasis added) in Dyer Investment's right to any profits, in accordance with the percentage of the site fee that Lents guaranteed. Thus, once an acceptable letter of credit was posted, the IPA mandates that, at that point, Lents had an enforceable right to participate in any profits.

This leaves the primary issue, which was noted succinctly by the trial judge: "Nothing in the contract requires Dyer to furnish [the] information [on the terms of the letter of credit] at any particular time to Lents." In his affidavit, Kelly stated that the sub-investors, including Lents, asked repeatedly for the information to give to their banks in order to get the letters of credit issued,

---

[9] "When a contract is contingent on one party's satisfaction, that party must exercise his or her judgment in good faith and as a reasonable person, when a definite objective test of satisfaction is available; not arbitrarily without bona fide reason for his or her dissatisfaction." 13 RICHARD A. LORD, WILLISTON ON CONTRACTS § 38:24 (4th ed. 2000).

[10] The appellate record does not indicate that Dyer Investment found unacceptable the financial institution selected by Lents to issue the letter of credit or any other terms indicated in the "commitment" letter proffered by Lents to Kelly.

including "the form letter of credit, where and when these were to be sent, who the letters were to be payable to, and things of that nature."[11] The trial judge observed that this information was "never furnished by Dyer to Lents, or to anyone else for that matter." Finding that Dyer Investment was not required to do so under the IPA, the trial judge concluded that this was an essential term, missing from the document, and that consequently the IPA constituted only preliminary negotiations and was not a contract. We consider this finding in some detail.

Courts will not enforce a contract that is vague or indefinite or missing essential terms, and will not make a new contract for the parties. *Four Eights, LLC v. Salem*, 194 S.W.3d 484, 487 (Tenn. Ct. App. 2005) (citation omitted); *Marshall v. Jackson & Jones Oils, Inc.*, 20 S.W.3d 678, 682 (Tenn. Ct. App. 1999) (citation omitted). However, a finding that a contract is sufficiently definite is favored, so as to carry out the reasonable intentions of the parties. Thus, courts will seek to avoid finding that an agreement is too uncertain to be enforceable by considering the surrounding circumstances and the conduct of the parties. *See In re Estate of Ohrt*, 516 N.W.2d 896, 901 (Iowa 1994) (citation omitted).

This may at times result in the court implying a term not expressly stated in the contract. When the parties' bargain is sufficiently definite to be a contract, but they have not agreed with respect to a term that is necessary to a determination of their rights and duties, a term which is reasonable may be supplied by the court. RESTATEMENT (SECOND) OF CONTRACTS § 204 (1981). For example, "failure of the parties to fix a time or a definite time for performance does not normally defeat a contract." *First Nat. Bank of Bluefield v. Clark*, 447 S.E.2d 558, 562 (W. Va. 1994) (citations omitted). The court will usually imply a term requiring performance within a reasonable time under the circumstances. *Minor v. Minor*, 863 S.W.2d 51, 54 (Tenn. Ct. App. 1993).

Moreover, every contract imposes on the parties a duty of good faith and fair dealing in its performance. RESTATEMENT (SECOND) OF CONTRACTS § 205 (1981). For example, every contract includes an implied condition that one party will not prevent performance by the other party. *See Moody Realty Co. v. Huestis*, 237 S.W.3d 666, 678 (Tenn. Ct. App. 2007) (citation omitted). This is easily seen where the prevention of the other party's performance takes the form of active hindrance:

> In any kind of contract, if the right of one party to compensation is conditional upon the rendition of some service or other performance by him . . ., it is nearly always a breach of contract for the other party to act so as to prevent . . . the performance of the condition. It is a breach of duty, only because the court finds a promise by implication not to prevent or hinder.

---

[11]The form IPA specified that the letter of credit was to be issued "in favor of [Dyer Investment] as beneficiary thereunder." However, in his affidavit, Kelly claimed that, after First Tennessee Bank indicated that it was no longer willing to provide the primary financing to Dyer Investment, Walker told Kelly that the other financial institutions from whom Dyer Investment was seeking financing might require that the back-up letters of credit be made payable to an entity other than Dyer Investment.

6 ARTHUR LINTON CORBIN, CORBIN ON CONTRACTS § 571 (Interim ed.). *See Frank Fitzgerald, Inc. v. Pacella Bros.*, 310 N.E.2d 379, 381 (Mass. App. Ct. 1974) (holding that the subcontractor had a right to recover from the general contractor under the contract despite the subcontractor's failure to fully perform because the subcontractor's work was halted by an agent of the general contractor). Where the plaintiff's performance has been wrongfully prevented or hindered by the conduct of the defendant, "[o]nly the law of the jungle would say that plaintiff's failure to perform should not be excused." PERILLO, *supra*, § 11.28.

In some circumstances, the obligee may unjustly prevent the obligor's performance merely by inaction, that is, passive non-cooperation. *Id.* In such a case, the court may find an implied or constructive condition requiring the obligee to render active cooperation, so as not to prevent the performance of the obligor:

> If a contract is such that a certain performance by one party is necessary in order to earn the compensation that has been promised him, and that performance can not be rendered without the active co-Operation of the other party, a promise to render such co-Operation will usually be implied. If the performance promised by one party is such that it can not be performed until the promisee has first laid the foundation on which it is to be built or otherwise done, the laying of that foundation is a constructive condition of the duty of the promisor. . . . Co-Operation in good faith is impliedly promised by the one party and is also a constructive condition of the duty of the other party.

CORBIN, *supra*, § 570. In some situations, such an implied or constructive condition may not be implied from the language of the contract. Rather, it is "imposed by law to do justice." PERILLO, *supra*, § 11.8. The Restatement frames the issue in the context of the duty of good faith and fair dealing, noting: "[B]ad faith may be overt or may consist of inaction, and fair dealing may require more than honesty," and bad faith can include "failure to cooperate in the other party's performance." RESTATEMENT (SECOND) OF CONTRACTS § 205 cmt. d (1981). The Restatement indicates that, in such circumstances, a contractual term requiring the act of cooperation may be supplied by the court:

> A . . . common example occurs where an obligor's duty cannot be performed without some act by the obligee, and the court supplies a term making that act a condition of the obligor's duty. In most such situations, the obligee's own obligation of good faith and fair dealing . . . imposes on him a duty to do the act.

*Id.* § 226 cmt. c.

As with active prevention of another's performance, passive non-cooperation by one party may excuse performance by the other party:

> Where a duty of one party to a contract is subject to the occurrence of a condition, the additional duty of good faith and fair dealing imposed on him may require some cooperation on his part, either by refraining from conduct that will prevent or hinder

-14-

the occurrence of that condition or by taking affirmative steps to cause its occurrence; non-performance of that duty when performance is due is a breach, and that has the further effect of excusing the non-occurrence of the condition itself, so that performance of the duty that was originally subject to its occurrence can become due in spite of its non-occurrence.

13 RICHARD A. LORD, WILLISTON ON CONTRACTS § 38:11 (4th ed. Supp. 2008). Thus, if a party fails to cooperate in the occurrence of a condition for the purpose of avoiding performing the contract, the occurrence of the condition is excused. ***See Kemmons Wilson, Inc. v. Allied Bank of Tex.***, 836 S.W.2d104, 111–12 (Tenn. Ct. App. 1992).

Here, Dyer Investment's duty to give Lents a participation interest was subject to Lents having posted an acceptable letter of credit. The letter of credit could not be issued without active cooperation by Dyer Investment, by supplying foundational information. If the principle outlined above is applied in this case, the duty of good faith and fair dealing imposed on Dyer Investment would require Dyer Investment to take affirmative steps to cooperate in the issuance of the letter of credit, namely by providing the terms of the letter of credit to Lents. Its failure to do so would constitute passive non-cooperation, a breach of its duty to cooperate in Lents' performance of his duty to have the letter of credit issued. Dyer Investment's breach of this implied duty to cooperate would have the effect of excusing Lents' failure to post the letter of credit, thereby entitling Lents to his participation interest even in the absence of a letter of credit.

Should this Court find an implied or constructive condition in the IPA, requiring Dyer Investment to cooperate in Lents' performance by furnishing Lents the basic information necessary for the issuance of a letter of credit? We are mindful of the Court's obligation to refrain from making a new contract for the parties; this important principle was the primary reason for the trial court's grant of summary judgment in favor of Dyer Investment. Here, however, the circumstances clearly warrant the implication of such a condition.

First, we find that the IPA sufficiently defines the parties' bargain to be deemed a contract, even absent an express term requiring Dyer Investment to furnish Lents the basic information necessary to enable Lents to perform. The nine-page form IPA, drafted by Dyer Investment, sets out the surrounding circumstances and details Lents' obligation to furnish an acceptable letter of credit in the specified amount. It includes numerous "representations and warranties" by both parties, including representations by both Lents and Dyer Investment that they are authorized to execute and perform the Agreement. It states that "this Agreement is the legal, valid, and binding obligation of [Dyer Investment] enforceable against [Dyer Investment] in accordance with its terms," and has a similar term as to Lents. The IPA authorizes Dyer Investment to draw on Lents' letter of credit, and details the manner in which that would be done. It specifies Lents' share of the Lead Investor Fee, complete with an example demonstrating how Lents' share would be calculated. The IPA states that neither party has responsibility for the results of the fight or the amount of the proceeds from ticket sales, provides that it can be modified only by written agreement, and includes numerous standard "boilerplate" provisions on governing law, severability, and the like. Thus, the language and specificity in the IPA indicate a clear intent "to make an effective, rather than a nugatory, agreement"

in which both parties had binding obligations, rather than a one-sided document which would bind only one party.  17A AM. JUR. 2D *Contracts* § 341 (2004); *see Scott*, 255 S.W.2d at 405.  This conclusion is also supported by our obligation to interpret the document against the party who drafted it, here, Dyer Investment. *See Ralph*, 183 S.W.3d at 367; *see also* RESTATEMENT (SECOND) OF CONTRACTS § 206 (1981).

Second, the act of cooperation required of Dyer Investment to enable Lents to perform was minimal.  In order to perform his duty to post the letter of credit, Lents required only perfunctory foundational information, such as the name of the party to whom the letter of credit should be made payable.  There is no indication in the record that Dyer Investment was unable to provide such information to Lents.[12]   Thus, the burden for Dyer Investment to cooperate in Lents' performance was *de minimus*.

Most importantly, the nature and structure of the contract compels the finding of an implied requirement of cooperation by Dyer Investment.  The contract centered on an allocation of risk and potential reward.  Dyer Investment had assumed the risk of losing over $12 million in order to obtain the rights to the potential profits from the fight.  It sought sub-investors willing to take on a portion of the potential risk in return for an opportunity to share in those profits if they materialized.  Without the implication of a requirement that Dyer Investment cooperate in Lents' performance, Dyer Investment reaps the benefit of having sub-investors such as Lents available to absorb the risk while giving up none of the potential profits from the fight.  As noted above, had Dyer Investment at any time furnished the information at issue to Lents, Lents was obliged under the mandatory language in the IPA to post a letter of credit, guaranteeing the specified portion of the site fee.  Under the interpretation advocated by Dyer Investment, if it appeared that ticket sales would fall below the minimum, Dyer Investment had the ability to hold Lents to his promised guaranty by providing the terms of the letter of credit to Lents; if it appeared that ticket sales would exceed the minimum, Dyer Investment could avoid its own performance and avoid paying Lents any portion of the profits simply by not providing the terms of the letter of credit to Lents, thus preventing Lents from posting the letter of credit.  Thus, Dyer Investment was, in effect, unjustly enriched by obtaining the safety net of Lents' guaranty without the concomitant risk of losing any portion of the profits.  Indeed, this is precisely what happened.

Under these circumstances, we find that the IPA included an implied or constructive condition requiring Dyer Investment to furnish Lents the information necessary for Lents to post the letter of credit as set out in the IPA.  Such an implied condition is clearly necessary to meet the ends of justice.  PERILLO, *supra*, § 11.8.

Dyer Investment's breach of its duty to furnish Lents with the required information would in turn excuse Lents from his obligation to have the letter of credit issued.  Under the terms of the IPA, then, Lents would "acquire a percentage interest in [Dyer Investment's] rights with respect to the Lead Investor Fee;" *i.e.*, the profits from the Lewis/Tyson fight.  Therefore, we must reverse the

---

[12]The issue of Dyer Investment's ability to provide this information to Lents may, however, be an issue of fact on remand to the trial court.

trial court's grant of summary judgment in favor of Dyer Investment on Lents' breach of contract claims.

As noted above the trial court also granted summary judgment to Dyer Investment on Lents' claims that Dyer Investment breached the covenant of good faith and fair dealing. The trial court based this holding on its findings that (1) a breach of the covenant of good faith and fair dealing is not a "stand alone" claim and is not actionable in the absence of an enforceable contract, and (2) Lents' good faith and fair dealing claim related to the execution of the Agreement and not its performance. As set forth above, we hold that the IPA constituted an enforceable contract, including an implied covenant of good faith and fair dealing. In addition, we must respectfully disagree with the trial court's finding that Lents' good faith and fair dealing claim related to the execution of the Agreement rather than to its performance. The facts as alleged by Lents would constitute a breach of Dyer Investment's implied duty to cooperate in Lents' performance by furnishing to Lents the information necessary for Lents to have the letter of credit issued in the amount specified in the IPA. This relates to Dyer Investment's duty to perform under the IPA, not execution of the IPA. Therefore, we must reverse the grant of summary judgment in favor of Dyer Investment on the claims of breach of the covenant of good faith and fair dealing.

Lents did not appeal the trial court's grant of summary judgment on the issue of whether he could recover punitive damages against Dyer Investment. Consequently, we affirm the trial court's decision on this issue.

Lents argues on appeal that the trial court erred in stating that Lents "lost no money" in his dealings with Dyer Investment, and seeks the opportunity to show that he expended monies in making the arrangements for the back-up letters of credit through his bank, which were to be backed with a home equity loan that required substantial out-of-pocket closing costs. This issue is pretermitted by our reversal in part of the trial court's grant of summary judgment.

## CONCLUSION

In conclusion, the trial court's grant of summary judgment to Dyer Investment is reversed as to Lents' claims for breach of contract and breach of the covenant of good faith and fair dealing, and is affirmed as to the claim for punitive damages. On remand, as noted by the trial court, there will undoubtedly be numerous disputed issues of fact.

The decision of the trial court is affirmed in part and reversed in part, as set forth above in this Opinion. Costs of this appeal are assessed against Appellee Dyer Investment Company, LLC, for which execution may issue if necessary.

_____
HOLLY M. KIRBY, JUDGE

-17-