IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
March 6, 2019 Session

## HOWARD WHITE ET AL. v. WALTER C. GRIMES

**Appeal from the Chancery Court for Maury County**
**No. 16-233    Stella L. Hargrove, Judge**

_____

#### No. M2018-00880-COA-R3-CV

_____

This case involves an alleged contract for the sale of real property.  The proposed buyers, who were originally lessees of the property, brought suit to enforce the alleged agreement, seeking specific performance and damages.  After a trial, the Maury County Chancery Court held that a contract for the sale of the property did exist and that specific performance of the contract should be awarded.  Certain monetary damages were also awarded to the former lessees.  Having reviewed the record transmitted to us on appeal, we affirm in part and reverse in part.  Although we affirm the chancery court's decision that a valid contract exists and that the contract is properly subject to specific performance, we reverse the award of damages that is challenged on appeal for the reasons stated herein.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed in Part, Reversed In Part, and Remanded**

ARNOLD B. GOLDIN, J., delivered the opinion of the Court, in which J. STEVEN STAFFORD, P.J., W.S., and KENNY ARMSTRONG, J., joined.

Charles M. Cain, II, Randall E. Bruce, Adrian H. Altshuler, and Charles G. Blackard, III, Franklin, Tennessee, for the appellant, Walter C. Grimes.

Donald Capparella, Nashville, Tennessee, for the appellees, Howard White and Sheila White.[1]

---

[1] We observe that counsel for the appellees on appeal in this court was not counsel of record for the Whites in the trial court proceedings.

**OPINION**

**BACKGROUND AND PROCEDURAL HISTORY**

Walter Grimes began leasing real property with improvements to Sheila[2] and Howard White in late 2009. Although the original lease term was for two years, the lease provided that if neither party gave notice of termination, "the Lease will automatically be extended on a month-to-month basis with all terms remaining the same."[3] At the time the present dispute originated, the Whites were month-to-month tenants.

The Whites operated a store and restaurant called Doodads[4] on the property at issue, and throughout the pendency of their time as tenants, Mr. Grimes would frequently encourage them to buy his property. Although Mr. Grimes' repeated solicitations initially went unheeded, discussions over the purchase of his property gained more serious traction in late 2015. On November 3, 2015, Mr. Grimes presented the Whites with a notice of intent to sell the property, and on December 1, 2015, the parties reached an agreement that the property would be sold to the Whites for $145,000.00. This agreement was later memorialized in a writing dated December 3, 2015 ("the December 3 writing"), which was prepared and signed by Mr. Grimes. In pertinent part, the December 3 writing stated as follows:

> I, Walter Clifford Grimes, . . . am selling to Howard and [Sheila] White, the property . . . located at 2696 Williamsport Pike, Columbia TN, 38401 for $145,000.00. The buyers, Howard and [Sheila] White, will be responsible for paying all costs related to closing this transaction. This sale will include the building, signage, gas and diesel pumps, holding tanks, furniture and appliances, as well as dishes and silverware and cookware.

The December 3 writing was subsequently taken to Heritage Bank & Trust ("the Bank") by both the Whites and Mr. Grimes, albeit separately, and the Bank thereafter contacted Security Title & Escrow, who performed a title search and issued a title commitment. Mr. Grimes subsequently refused to close on the sale, however, prompting the Whites to pursue the present litigation.

In a complaint filed with the Maury County Chancery Court on May 18, 2016, the Whites alleged that the December 3 writing was a valid contract, and they contended that

---

[2] Although Mrs. White's first name is spelled alternatively as "Shelia" at several different places in the record, we employ the spelling utilized in the caption of her complaint and in the body of her appellate brief.

[3] This extension providing that all terms would remain the same was subject to an exception that reserved the right of the landlord to increase the amount of rent upon proper notice.

[4] The name of the Whites' store and restaurant is spelled and presented differently at various places in the record, but we employ the presentation utilized in the body of their appellate brief.

Mr. Grimes had breached it when he refused to go through with the sale of the property. In addition to praying for a decree of specific performance, the Whites prayed that they recover any damages to which they may be entitled. In his answer, filed September 2, 2016, Mr. Grimes denied that the December 3 writing was a legal and binding agreement, and he requested that the chancery court dismiss the Whites' claim. A trial on these matters occurred on December 4 and 5, 2017.

The proof at trial consisted of the testimony of multiple witnesses, as well as the introduction of a number of exhibits. In addition to focusing on the December 3 writing and the parties' discussions antecedent thereto, the evidence highlighted a number of other documents which were exchanged subsequent to the November 2015 notice of intent to sell.

### Notice of Intent to Sell

As noted above, Mr. Grimes frequently suggested over the years that the Whites should buy his property. This fact was substantiated not only by the testimony of Mr. Grimes' wife, Abbie Grimes,[5] but also by the testimony of Mr. Grimes himself. Although these general solicitations originally proved to be unfruitful, Mr. Grimes reached out again to the Whites in November 2015 to formally express his interest to sell the property. As Mrs. White specifically testified to at trial, Mr. Grimes presented the Whites with a notice of intent to sell the property on November 3, 2015. This notice, a copy of which was introduced as an exhibit at trial, offered to sell Mr. Grimes' building, as well as its contents, for the sum of $150,000.00. The notice stated that should the Whites choose not to purchase his property, Mr. Grimes would list it with a real estate company and that "the listed price will be at One hundred and seventy thousand dollars ($170,000) for the business and sixty thousand dollars ($60,000.00) will be charged for the contents." Within the notice, Mr. Grimes included language requesting the Whites to "let me know as soon as possible, prior to January 10, 2016." According to Mr. Grimes' testimony at trial, his intention for including such language was that he "needed something from the bank stating that the loan was approved." The notice did not, however, communicate this as a term of the proposed offer; rather, the notice simply indicated that the Whites should give Mr. Grimes notice of their intent to purchase the property by January 10, 2016, lest he list it for sale with a realtor at a higher price.

According to Mrs. White, after she and her husband received the notice of intent to sell, they took it to their banker, Bobby Daniels, at the Bank. She testified that they subsequently filled out a loan application and claimed that they were later pre-approved for a loan.

---

[5] We note that Mrs. Grimes' testimony indicated that she did not have an ownership interest in the property at issue.

### *December 1 agreement and the December 3 writing*

Mrs. White's testimony revealed that, on December 1, 2015, she and her husband had a discussion with Mr. Grimes where they reached an agreement to purchase the property for $145,000.00. According to Mrs. White, she and her husband agreed that they would pay for closing costs, and her testimony indicated that the parties' December 1 agreement was subsequently memorialized by Mr. Grimes in the December 3 writing. Mrs. White testified that, upon receipt of the December 3 writing, she took it to Mr. Daniels at the Bank.

Other witnesses corroborated Mrs. White's account that an agreement had been reached on December 1. During his testimony, Mr. White stated that when Mr. Grimes had given him and his wife the December 3 writing, Mr. Grimes had said that it was "all he'd agreed to." Mr. Grimes' testimony also revealed that an agreement had been reached on December 1. Specifically, Mr. Grimes admitted that the Whites had informed him on December 1 that they were going to buy his property for $145,000.00. He further admitted that the December 3 writing was an accurate memorialization of the parties' agreement. Indeed, when the December 3 writing was shown to him during the course of trial, the following colloquy ensued:

> Q. That December 3rd document, this right here -- I'm going to show what's in the record as D18, demonstrative Exhibit 18. You do admit this is consistent with what you discussed on December 1st?
>
> A. Yes.
>
> Q. So it's an accurate memorialization of what y'all's agreement was, correct?
>
> A. Correct.
>
> Q. And that's your signature?
>
> A. Appears to be, yes.
>
> Q. Do you not admit that this is your signature?
>
> A. Yes, that's my signature.

Mr. Grimes also took the December 3 writing to the Bank, although unlike the Whites, he did not take it directly to Mr. Daniels. According to the testimony of Michael Flynt, a loan officer with the Bank, Mr. Grimes "brought in [the December 3] contract document .

. . and left with me to provide to Bobby [Daniels]." Despite his admission that the December 3 writing was an accurate memorialization of an agreement made between him and the Whites, Mr. Grimes testified that he did not intend for the December 3 writing to be a binding contract.

### *The Form Agreement and the December 19 writing*

As is of some dispute in the present appeal, additional documents were exchanged between the Whites and Mr. Grimes following the creation of the December 3 writing. After the Whites took the December 3 writing to the Bank, it was accepted by Mr. Daniels, but according to Mrs. White, Mr. Daniels suggested that the Whites should try to enter into a more "in-depth" contract. However, per Mrs. White's testimony, Mr. Daniels claimed that it would not be a problem if Mr. Grimes would not agree to sign this additional document. As Mrs. White explained at trial:

> [Mr. Daniels] was just saying that it would help out, be more in detail to the -- not nothing -- like I said, he said it didn't matter if [Mr. Grimes] signed it or not, or he wanted to do it. It would not hurt the original contract, but he just said it was more in depth.

A copy of this additional document, a form "Purchase and Sale Agreement" ("the Form Agreement"), was entered into evidence at trial, and as testified to by Mrs. White, it contained a few additional terms from the December 3 writing. For example, whereas the December 3 writing had stated that the Whites would be responsible for paying all closing costs, Mrs. White indicated that the Form Agreement proposed that the Whites would pay all closing costs *if* certain repairs were made by Mr. Grimes. Mrs. White testified, however, that additional earnest money was offered and that it was not her intention to revoke the agreement she claims was evidenced by the December 3 writing.

According to Mrs. White, Mr. Grimes rejected the Form Agreement and indicated that he was "going with" the December 3 writing. In rejecting the Form Agreement, Mr. Grimes also tendered a multiple-page document dated December 19, 2015 ("the December 19 writing"). This document had been typed up by Mrs. Grimes, who admitted that the document was full of inconsistencies and had "a lot of typographical errors and run-on sentences and whatever." Among other things, the December 19 writing referenced a previous agreement to sell Mr. Grimes' property for $145,000.00, but it also stated that "AS OF MIDNIGHT, JANUARY 9, 2016, ALL PRIOR AGREEMENTS FOR THE SALE OF THE AFOREMENTIONED PROPERTY AND ITS CONTENTS FOR ONE HUNDRED AND FORTY-FIVE THOUSAND DOLLARS, WITH THE POTENTIAL BUYERS (HOWARD AND [SHEILA] WHITE) WILL BE NULL AND VOID UNLESS THE OWNER IS PRESENTED WITH WRITTEN EVIDENCE THAT THE POTENTIAL [BUYERS] HAVE ACQUIRED THE FINANCING TO PURCHASE THE AFOREMENTIONED PROEPRTY." Of course,

the December 3 writing, which was an admitted memorialization of the parties' prior December 1 agreement, did not indicate that the existence of Mr. Grimes' contractual obligation was somehow contingent on whether the Whites provided written proof of financing.

### *Preparations for Closing/Mr. Grimes backs out*

After both sides had delivered the December 3 writing to the Bank,[6] a number of preparations were made by both the Bank and Security Title & Escrow. The Whites' banker, Mr. Daniels, testified that he contacted Security Title & Escrow to perform title work on the property. According to Mr. Daniels, the Bank would have been ready to close by January 15, 2016. Consistent with Mr. Daniels' testimony, Robert DuBois, the owner of Security Title & Escrow, testified that his company was contacted by a lender at the Bank. As he stated at trial, "Just got a message one day from the loan officer that he would be sending us some information, contract, and wanted to retain our services to handle the closing for him." Mr. DuBois stated that his company had received a copy of the December 3 writing from the Bank and that they had worked off that document. According to Mr. DuBois, an average closing takes about 30 to 60 days, and he represented that it would have been possible to close by January 15. He further testified that he had completed the first round of title search and that a title commitment had issued. When asked at trial if he knew why closing did not ultimately occur, Mr. DuBois responded as follows:

> No, ma' am. I had no knowledge of that. Did have the seller, I believe Mr. Grimes, come in and tell us that he wasn't prepared to close at all on the transaction. I think we may have then called the bank and told them what we knew. I think we kind of set quiet waiting at that point until somebody contacted us for further action.

Mr. Grimes agreed in his testimony that it would be reasonable to close within 60 days from reaching an agreement. Notably, however, similar to Mr. DuBois' testimony, other witnesses indicated that Mr. Grimes had decided he simply was not going to go forward with selling the property. Mr. White testified that Mr. Grimes had "backed out at the last moment." Moreover, as Mrs. Grimes described the situation, "[On Monday January 11,] [h]e came home, and he said that he had went to the bank and told them everything was off."

---

[6] Witnesses from both the Bank and Security Title & Escrow indicated that they were proceeding in accordance with the December 3 writing. For instance, the owner of Security Title & Escrow testified that neither the November 3, 2015 notice of intent to sell nor the December 19 writing was in his working file. Moreover, Mr. Flynt testified that he did not recall Mr. Grimes ever delivering a copy of the December 19 writing to him at the Bank.

### *Chancery Court's Ruling*

Following the conclusion of the trial proceedings, the case was taken under advisement, and on December 27, 2017, the chancery court entered its "Memorandum" order, wherein the court held that a "valid, enforceable contract existed between the parties." The chancery court ruled that the Whites were entitled to specific performance, but it also held that they would be awarded "provable damages" incurred as a result of Mr. Grimes' failure to close the sale. Subsequently, on February 1, 2018, the chancery court entered its "Order of Judgment." In this order, the court specified that Mr. Grimes "shall execute a General Warranty Deed" incident to the court's order of specific performance, and the court also awarded the Whites certain damages. Among the damages awarded were rental payments made to Mr. Grimes after his breach of the parties' contract and certain closing fees. Although Mr. Grimes subsequently filed a motion to alter or amend or set aside the chancery court's ruling, his motion was denied. This appeal followed.

## ISSUES PRESENTED

In his brief on appeal, Mr. Grimes raises four issues for our review, which we restate as follows:

1. Whether the chancery court erred in finding that there was an enforceable contract.
2. Whether the chancery court properly determined that the December 3 writing satisfied the Statute of Frauds.
3. Whether the chancery court erred in ordering Mr. Grimes to execute a general warranty deed.
4. Whether the chancery court erred in its award of damages.

## STANDARD OF REVIEW

This case was decided following a bench trial. As such, we review the record de novo and presume that the trial court's findings of fact are correct unless the preponderance of the evidence is otherwise. Tenn. R. App. P. 13(d). "[F]or the evidence to preponderate against a trial court's finding of fact, it must support another finding of fact with greater convincing effect." *Nashville Ford Tractor, Inc. v. Great Am. Ins. Co.*, 194 S.W.3d 415, 425 (Tenn. Ct. App. 2005). Questions of law, including questions of contract formation, are reviewed de novo and are not entitled to any presumption of correctness. *German v. Ford*, 300 S.W.3d 692, 701-02 (Tenn. Ct. App. 2009)**.**

## DISCUSSION

### *The Existence of a Valid Contract*

- 7 -

We turn first to the overarching question in this appeal: whether the parties had a valid contract for the sale of the property. "A contract 'must result from a meeting of the minds of the parties in mutual assent to the terms, must be based upon a sufficient consideration, free from fraud or undue influence, not against public policy and sufficiently definite to be enforced.'" *Staubach Retail Servs.-Se., LLC v. H.G. Hill Realty Co.*, 160 S.W.3d 521, 524 (Tenn. 2005) (quoting *Doe v. HCA Health Servs. of Tenn., Inc.*, 46 S.W.3d 191, 196 (Tenn. 2001)). To determine whether there is mutuality of assent, courts apply an objective standard based upon parties' manifestations. *Id.*

The chancery court concluded that a valid contract had been formed in this case and held that the contract was evidenced by the December 3 writing signed by Mr. Grimes. In relevant part, the court stated as follows:

> It is undisputed that [on] approximately December 1, 2015, oral negotiations began between the parties with Mr. Grimes offering to sell the property to Plaintiffs for $150,000. Plaintiffs made a counter offer of $145,000. It is undisputed that Mr. Grimes accepted the counter offer; he either drafted the December 3rd document himself, or had someone draft it for him; he delivered it to Plaintiffs; and later delivered it to The Bank, knowing it would be relied upon for financing the purchase. At this point a valid, enforceable contract existed between the parties on December 3, 2015. There is mutual assent to the terms of sale; there is sufficient consideration; there is no fraud or undue influence; it is not against public policy and the agreement is sufficiently definite to be enforceable.

For the reasons that follow, we are in agreement with the chancery court that a valid contract existed.

Based on Mr. Grimes' own testimony, there is no dispute that the parties reached an agreement on December 1, 2015. Specifically, the parties agreed that the Whites would purchase Mr. Grimes' property for $145,000.00, not the $150,000.00 that Mr. Grimes had originally proposed in his November 2015 notice of intent to sell. Incident to this agreement, the Whites agreed that they would pay closing costs, and Mr. Grimes admitted that the parties' agreement from December 1 was memorialized in the December 3 writing signed and prepared by him. In light of the testimony that an agreement had been reached to sell the property for $145,000.00 and the subsequent memorialization of that agreement, we find no error in the chancery court's conclusion that the December 3 writing evidenced the parties' contract. We would also again note that, once the parties' agreement concerning the property had been memorialized, both sides took the December 3 writing to the Bank, and thereafter, preparations for a closing began when the Bank contacted Security Title & Escrow.

When Mrs. Grimes was cross-examined about the December 3 writing by counsel for the Whites, counsel for Mr. Grimes objected stating, "Your Honor, I'm also going to object, as he did. Obviously, the *contract* speaks for itself. I mean, we know the *contract.* It's in evidence." (emphases added). Although Mr. Grimes' counsel presumably did not intend to formally recognize the December 3 writing as a contract, this apparent slip of the tongue simply highlighted what the proof readily demonstrated: the parties had reached a valid agreement regarding a sale of Mr. Grimes' property on December 1, 2015, and that agreement was memorialized by the December 3 writing.

On appeal, Mr. Grimes argues that there could not have been a meeting of the minds, because subsequent to the creation of the December 3 writing, the Whites prepared the Form Agreement. As has already been noted, the Form Agreement was prepared at the suggestion of Mr. Daniels, and it contained differing terms regarding the allocation of closing costs. For the reasons that follow, we find it to be of no moment that the Form Agreement proposed different terms than those memorialized in the December 3 writing.

Mr. Grimes' concern relative to the Form Agreement appears to be predicated on the legal premise that the December 3 writing strictly constituted an offer to the Whites, not a memorialization of an existing agreement. Indeed, when discussing his concern that there is a lack of harmony between the December 3 writing and the subsequently-prepared Form Agreement, he notes as follows in his appellate brief: "[T]he Whites' outright rejection of the closing costs provision . . . is a ***change*** to the terms in Grimes's offer." (emphasis in original). If the December 3 writing was properly understood as representing an offer of terms and not the memorialization of an agreement, Mr. Grimes' concern would not be misplaced. After all, it is well-settled law that an acceptance must be in accord with its offer. "In order that there may be a meeting of the minds which is essential to the formation of a contract, the acceptance of the offer must be substantially as made. There must be no variance between the acceptance and the offer." *Cummins v. Opryland Prods.*, No. M1998-00934-COA-R3-CV, 2001 WL 219696, at *2 (Tenn. Ct. App. Mar. 7, 2001) (quoting *Canton Cotton Mills v. Bowman Overall Co.*, 257 S.W. 398, 402 (Tenn. 1924)). Mr. Grimes' argument misses the mark here, however, because as already noted, an agreement had already been reached by December 3. As confirmed by Mr. Grimes himself, the December 3 writing was a memorialization of an *agreement* that had been reached on December 1. As such, the December 3 writing was not a mere offer to sell. Indeed, the December 3 writing is not cast in terms of a proposal or offer to sell, but instead begins by stating that, **"**I, Walter Clifford Grimes, . . . *am selling* to Howard and [Sheila] White, the property . . . located at 2696 Williamsport Pike, Columbia TN, 38401 for $145,000.00." (emphasis added)

The fact that the Whites proposed differing terms after they had reached an agreement with Mr. Grimes did not vitiate the existence of the parties' contract. The Whites' actions simply reflected an attempt to modify the terms of the existing

agreement. As we previously noted, Mrs. White testified that it was not her intention to revoke the agreement evidenced by the December 3 writing. The Form Agreement, she explained, was prepared at the suggestion of Mr. Daniels in an attempt to see if Mr. Grimes might agree to it. The Whites were not prohibited from seeking to supplement or modify their contract with Mr. Grimes, and as Mrs. White testified, additional earnest money was offered. Of course, Mr. Grimes was also not obligated to accede to the proposed additional terms. *See GuestHouse Int'l, LLC v. Shoney's N. Am. Corp.*, 330 S.W.3d 166, 190 (Tenn. Ct. App. 2010) (noting that the modification of an existing contract requires the consent of both parties and, generally, reciprocal consideration). His rejection of the Form Agreement, while completely permissible, did not disturb the validity of the existing agreement memorialized in the December 3 writing.

Mrs. White further testified that Mr. Grimes indicated that he was "going with" the December 3 writing when he rejected the Form Agreement. He also, however, tendered the December 19 writing, which, while referencing a previous agreement to sell the property for $145,000.00, also stated that all prior agreements would be null and void unless written evidence of financing was provided. Just as the Whites' proposed additional terms from the Form Agreement could not be binding on the parties absent Mr. Grimes' consent, Mr. Grimes could not bind the Whites outside of the existing agreement through unilateral action. *See Balderacchi v. Ruth*, 256 S.W.2d 390, 391 (Tenn. Ct. App. 1952) ("Modification of an existing contract cannot be accomplished by the unilateral action of one of the parties."). Although the parties may have exchanged documents subsequent to the creation of the December 3 writing that proposed, or purported to impose, additional contractual terms, none of the additional terms are binding or enforceable in the absence of mutual assent.

Although Mr. Grimes also raises an issue of whether there was proper compliance with the Statute of Frauds in this case, we find that the December 3 writing is enforceable under the Statute of Frauds. Pursuant to Tennessee Code Annotated section 29-2-101, no action shall be brought upon a contract for the sale of lands "unless the promise or agreement, upon which such action shall be brought, or some memorandum or note thereof, shall be in writing, and signed by the party to be charged therewith." Tenn. Code Ann. § 29-2-101(a). Here, the parties' agreement was memorialized in the December 3 writing, and it is undisputed that the December 3 writing was signed by Mr. Grimes. He is properly considered the "party to be charged" because enforcement of the contract is sought against him. *See id.* ("In a contract for the sale of lands . . . the party to be charged is the party against whom enforcement of the contract is sought."); *see also Blair v. Brownson*, 197 S.W.3d 681, 685 (Tenn. 2006) ("[T]oday [we] announce a new rule . . . that interprets "party to be charged" in the Statute of Frauds analysis to refer to the party against whom enforcement of the contract is sought."). It appears, however, that Mr. Grimes' specific quarrel regarding the Statute of Frauds lies in his assertion that the December 3 writing does not contain all of the terms of the parties' agreement. He appears to suggest that if the Statute of Frauds is satisfied in this case, it can only be

satisfied by considering other documents exchanged in this matter, including the December 19 writing. We reject Mr. Grimes' contention. The proof at trial shows that (1) the parties reached an agreement on December 1, 2015 and (2) the December 3 writing was an accurate memorialization of that agreement. Other terms which were proposed or purported to be imposed by the parties were not the subject of mutual assent.

### *Remaining Issues*

The remaining issues on appeal follow from the chancery court's finding that an enforceable contract for sale existed in this case. As a result of its determination that a valid contract had been formed and that Mr. Grimes had breached the contract, the chancery court held that the Whites were entitled to specific performance and certain damages. In this appeal, Mr. Grimes challenges the relief awarded to the Whites on several fronts.

We first address Mr. Grimes' assertion that the chancery court erred in ordering him to execute a general warranty deed incident to the court's order of specific performance. According to Mr. Grimes, it was error for the chancery court to award execution of a general warranty deed because the December 3 writing did not include a provision regarding the type of deed to be given. In defense of the chancery court's action, the Whites note in their appellate brief that a court may supply a reasonable term in a contract in order to carry out the purposes of the contract. *See German*, 300 S.W.3d at 706 ("When the parties' bargain is sufficiently definite to be a contract, but they have not agreed with respect to a term that is necessary to a determination of their rights and duties, a term which is reasonable may be supplied by the court."). The Whites argue that the intention here was for the sale of the property to be free and clear of Mr. Grimes' mortgage.[7]

We agree with the Whites that it was reasonable to require specific performance by execution of a general warranty deed, and we note that several courts have held that when no specificity as to the type of deed for transfer is provided in the parties' contract, a

---

[7] We note that, when discussing the issue of closing during Mr. Grimes' cross-examination by the Whites' trial counsel, the following exchange occurred:

> Q. [Closing is] where you get your money, isn't it?
> A. Eventually, yes.
> Q. Or eventually. At closing is when you get your money?
> A. Yes.
> Q. Not when the loan is approved. That's when the property transferred. You get money to pay on your loan in this case, your loan with Heritage Bank, correct?
> A. Correct.

Mr. Grimes also agreed that when buyers such as the Whites attempt to get a loan approved, they have to be sure that their bank/lender is going to get clear title.

- 11 -

general warranty deed may be implied. *See Busching v. Griffin*, 465 So.2d 1037, 1040 (Miss. 1985) ("[A] contract to sell and convey real estate ordinarily requires a conveyance of the fee simple title clear of all liens and encumbrances. Therefore, when such a contract is silent as to the character of the deed to be made, the presumption arises that a warranty deed was intended."); *Ray v. Wooster*, 270 S.W.2d 743, 751 (Mo. 1954) ("In order to authorize specific performance . . . it is not necessary that the contract specify the character of the deed to be executed, since it may be implied that a conveyance of the fee by deed with general warranty is intended."); *Skinner v. Stone*, 222 S.W. 360, 361 (Ark. 1920) (noting that where a party agrees to convey land, but nothing is said as to the nature of the title to be conveyed, the law implies a deed in fee simple with covenants of general warranty); *White Hen Pantry, Inc. v. Cha*, 574 N.E.2d 104, 108 (Ill. App. Ct. 1991) (stating that "it can be implied that a warranty deed was intended"); *see also* 71 Am. Jur. 2d *Specific Performance* § 41 ("[T]he failure of a real estate contract to specify the type of deed to be delivered to the purchaser does not preclude specific performance; it may be implied that a conveyance of the fee by deed with a general warranty is intended."). Additionally, we again note that during his testimony, Mr. Grimes agreed that when buyers such as the Whites attempt to get a loan approved, they have to be sure that their bank/lender is going to get clear title. We find the reasoning in the above decisions persuasive and decline to disturb the chancery court's judgment on this issue.

In addition to the grievance discussed above, Mr. Grimes asserts that various items of damages were improperly awarded by the chancery court. Among the damages with which he takes issue, Mr. Grimes specifically challenges an award of $300.00 for "Closing fees" and an award of $2,300.00 for an appraisal fee. According to Mr. Grimes, these costs are related to the loan closing process, and as such, the December 3 writing, assuming it evidences a contract, places the burden of these costs on the Whites, not Mr. Grimes. For the reasons that follow, we agree with Mr. Grimes that the trial court's judgment should be reversed as to these specific awards.

Initially, we agree with Mr. Grimes that the contract at issue requires the Whites to assume all costs incident to the loan closing process. Indeed, a portion of the December 3 writing specifically reads as follows: "[The Whites] will be responsible for paying all costs related to closing this transaction." We further note that testimony at trial established that both "closing fees" and "appraisal fees" are generally considered to constitute closing costs. This was specifically testified to by Mr. DuBois, and according to Mr. Daniels, the Whites' banker, the Whites' agreement to pay any closing costs was consistent with the general custom that buyers pay their own appraisals, title examinations, and title insurance premiums.

Moreover, concerning the $300.00 for "Closing fees" that were awarded, it is unclear that such fees were actually incurred. First, we note that closing never actually occurred in this case. Indeed, it is because of Mr. Grimes' refusal to go through with

- 12 -

closing that the Whites commenced the present litigation. According to the chancery court's order, the $300.00 for "Closing fees" was established "[p]ursuant to the testimony of witnesses." Having reviewed the transcript of the trial proceedings, we presume the chancery court was referring to the testimony from Mr. DuBois. Although Mr. DuBois testified that an average closing fee "*would be* 250, $300," (emphasis added), that testimony obviously did not establish that any such fee was definitively incurred or what the specific amount was. The testimony simply related to what an average closing fee "would be."

It is also unclear how the $2,300.00 award for an appraisal fee can be sustained. As noted, the Whites' banker specifically testified that the Whites' agreement to pay any closing costs was consistent with the custom that they, as buyers, would pay for their own appraisals. Further, we are aware of no proof that Mr. Grimes' failure to close previously has somehow resulted in a need for an additional appraisal.[8] Moreover, the record does not reflect that there was any testimony at trial that additional expenses would be incurred, such as for updating the appraisal, due to Mr. Grimes' failure to close.

Lastly, we address Mr. Grimes' contention that the chancery court erred in awarding the Whites rental payments made after his breach of the contract. On appeal, Mr. Grimes argues that the chancery court's award was not supported by proper evidence. Specifically, he charges that the "Trial Court allowed the Whites to submit additional documentation *after* trial as proof of consequential damages." (emphasis added).

Upon our review of this issue, it is initially unclear to us how the totality of the rental payments cited by the chancery court could properly be recoverable by the Whites. The purpose of assessing damages in a breach of contract action is to place the plaintiff, as close as possible, in the same position he would have been in if the contract had been performed.[9] *Wilhite v. Brownsville Concrete Co., Inc.*, 798 S.W.2d 772, 775 (Tenn. Ct. App. 1990). Here, we fail to see how the chancery court's measure of damages seeks to accomplish this end. In our view, permitting the Whites to simply recover alleged rent payments does not gauge the relative position the parties would have been in had a

---

[8] On top of all these points, we observe that the chancery court's order is deficient regarding the "proof" actually cited to substantiate the award of $2,300.00. Although the court's order directs the reader to "see invoice attached hereto as Exhibit F," no invoice was attached as referenced. Instead, the Exhibit F that is included consists of two checks written by Mrs. White to pay the Bank. Ostensibly, the court referenced these checks to show that the Whites had paid the Bank, who had presumably directly paid for an appraisal of the property. In any event, we note that the checks do not appear to have been introduced into evidence during the actual trial proceedings.

[9] The mere fact that specific performance was involved in this case did not pretermit the trial court's consideration of awarding damages. *See Shanan v. Franklin Cnty.*, No. M2002-00725-COA-R3-CV, 2003 WL 23093836, at *9 (Tenn. Ct. App. Dec. 30, 2003) (noting that a trial court may award both specific performance and damages in proper circumstances).

closing occurred in January 2016. Indeed, as noted by Mr. Grimes, a number of expenses of home ownership from the period are effectively ignored, including insurance and other expenses of ownership which the Whites obviously did not have to incur for the property. The chancery court's measure of damages also does not in any way attempt to address whether, and to what extent, the amount of the alleged rental payments made by the Whites would have reduced their anticipated mortgage, which they had not yet entered into. These and other matters were ignored and not contemplated or considered in any sense by the chancery court.

The narrow scope of the chancery court's attempt to measure some damages notwithstanding, we share Mr. Grimes' specific criticism about the documentary support relied upon by the court to buttress its award of damages. As noted earlier in this opinion, after the chancery court concluded that Mr. Grimes had breached the parties' contract, it held in its "Memorandum" order that the Whites "will be awarded *provable* damages incurred as a result of Defendant's failure to close the sale." (emphasis added) Based on this language, the chancery court apparently was not satisfied that the evidence offered at trial had proven this claimed item of damages, and when it did later award damages, it did so on the basis of documentation that was never offered into evidence at trial. Indeed, when the chancery court held in its "Order of Judgment" that the Whites could recover rental payments made after Mr. Grimes' breach, it specifically referred to a number of checks that were appended to its order. Mr. Grimes maintains that the chancery court's reliance on these checks was in error because the checks were not offered into evidence at trial.

In their brief on appeal, the Whites do not dispute that the rent checks appended to the "Order of Judgment" formed the basis for the award at issue. Indeed, when discussing the matter, they argue as follows: "[T]he primary proof of consequential damages was simply all the checks paid for rent from January, 2016 through January 2018 while the parties were disputing the issue of whether there was an enforceable contract." The problem with this, of course, is that the checks were never offered into evidence at trial. Moreover, there is no indication that an additional hearing on damages was held following the entry of the court's "Memorandum" order. We agree with Mr. Grimes that these checks should not have been considered.[10]

The concern here therefore extends to more than the basis upon which the chancery court awarded damages to the Whites. Even assuming the narrow measure of damages was itself unassailable, the cited "proof" is not. Again, the chancery court relied upon documentation that was never submitted as evidence. This was obviously procedurally in error, and of course, even if the checks were considered as a proper item of evidence, which they are not, Mr. Grimes was never afforded an opportunity to provide

_____

[10] It appears that the checks were tendered to the chancery court by the Whites' trial counsel post trial.

- 14 -

countervailing proof. For all of the above reasons, we hereby reverse the award of damages regarding this issue.

## CONCLUSION

In light of the foregoing discussion, the judgment of the chancery court is affirmed in part and reversed in part. The case is hereby remanded to the chancery court for further proceedings consistent with this opinion.

_____

ARNOLD B. GOLDIN, JUDGE