FILED

03/24/2026

Clerk of the
Appellate Courts

IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
April 22, 2025 Session

## WALKER & ASSOCIATES, INC. v. CECILIA WALKER HEFFINGTON, ET AL.

**Appeal from the Chancery Court for Shelby County**
**No. CH-22-0488      Melanie Taylor Jefferson, Chancellor**

_____

### No. W2023-01360-COA-R3-CV

_____

This is an appeal from a trial court's decision to grant a motion to enforce a settlement agreement. The trial court conducted an evidentiary hearing and concluded that the parties had reached an enforceable agreement. We affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed and Remanded**

CARMA DENNIS MCGEE, J., delivered the opinion of the court, in which J. STEVEN STAFFORD, P.J., W.S., and VALERIE L. SMITH, J., joined.

W. Lewis Jenkins, Jr., Dyersburg, Tennessee, for the appellants, Walker & Associates, Inc., and Ceil Walker.

Jonathan C. Hancock and W. Preston Battle, IV, Memphis, Tennessee, for the appellees, Cecilia Lona Walker Heffington, Matthew Heffington, and Cecilia Lona, LLC.

### MEMORANDUM OPINION[1]

### I.   FACTS & PROCEDURAL HISTORY

---

[1] Rule 10 of the Rules of the Court of Appeals of Tennessee provides:

This Court, with the concurrence of all judges participating in the case, may affirm, reverse or modify the actions of the trial court by memorandum opinion when a formal opinion would have no precedential value. When a case is decided by memorandum opinion it shall be designated "MEMORANDUM OPINION", shall not be published, and shall not be cited or relied on for any reason in any unrelated case.

Ceil Walker is president and CEO of Walker & Associates, Inc., an advertising agency in Memphis. Her daughter, Cecilia Walker Heffington, was employed at Walker & Associates for several years. In 2022, Walker & Associates filed this lawsuit against Mrs. Heffington, her husband Matthew Heffington, and Cecilia Lona, LLC, which is a company formed by Mrs. Heffington. The complaint alleged that Mr. and Mrs. Heffington had developed the company to directly compete with Walker & Associates all while Mrs. Heffington remained employed by Walker. The complaint asserted ten separate counts: breach of duty of loyalty; breach of fiduciary duty; breach of contract of a non-compete agreement; breach of contract of a nondisclosure/confidentiality agreement; violation of the Tennessee Uniform Trade Secrets Act; tortious interference with contract; conversion; unjust enrichment; civil conspiracy; and a claim for injunctive relief. The defendants filed an answer, counterclaim, and third-party complaint. It asserted various claims on behalf of Mrs. Heffington against Walker & Associates and also Ms. Ceil Walker. Those claims included unjust enrichment and violations of the Fair Labor Standards Act for unpaid wages, overtime, and retaliation.

In November 2022, the original defendants, Mr. and Mrs. Heffington and Cecilia Lona, LLC, filed a motion to enforce a settlement agreement. The motion was supported by a declaration of Mrs. Heffington, a declaration of Mr. Heffington, and a copy of the following email sent from the email address of Mr. Heffington to all of the parties and their attorneys, with the "Subject" line stating "Settlement Agreement Reached":

> Between Ceil Walker and Walker & Associates, Inc. ("Walker") and Matthew Hef[f]ington, Cecilia Heffington, and Cecilia Lona, LLC ("Defendants") (collectively with Walker, the "Parties").
>
> Defendants to pay Walker lump sum of $75,000 within 14 days of execution of separate Confidential Settlement Agreement to be prepared by counsel for the Parties.
>
> Mutual release by all Parties.
>
> All Parties to dismiss their claims with prejudice within three business days following payment.
>
> /s/ Matthew Heffington
> /s/ Cecilia Lona Walker Heffington
> /s/ Ceil Walker

Ms. Walker had responded to this email message with the following statement: "I agree. Happy to have my Family back together!!!!"

According to the declarations of Mr. and Mrs. Heffington, Ms. Walker had sent an email to both of them on October 13, 2022, "requesting a meeting at her house without counsel present to discuss a potential resolution" of all claims between the parties in the lawsuit. The declarations stated that Mr. and Mrs. Heffington had attended a total of three meetings at Ms. Walker's home between October 13 and November 2. According to the declarations, the parties spent more than seven hours over the span of the three meetings negotiating and ultimately agreeing upon the terms of the settlement agreement email that they all signed and sent to all counsel at 4:46 p.m. on November 2. However, according to the declarations, "Ms. Walker refuses to sign a settlement agreement as we mutually agreed upon on November 2, 2022." The defendants' motion to enforce the settlement agreement also stated that the Heffingtons would be present in court at the hearing on the motion "should the Court wish to take evidentiary proof regarding this matter." The motion stated that the defendants had submitted drafts of an agreement to Ms. Walker and made multiple attempts to procure her signature, but she refused to execute an agreement as required by the November 2 email she signed. Nevertheless, the defendants argued that this "does not negate the fact that a binding settlement was reached between the parties." They argued that the email contained all material terms of the settlement -- payment, a mutual release, dismissal of all claims with prejudice, and maintaining the confidentiality of a settlement agreement -- and it was enforceable. They asked the trial court to grant their motion and order Ms. Walker to sign the agreement drafted by counsel, as it was simply "more formal documentation" of the email agreement.

Walker & Associates and Ms. Walker filed a response in opposition to the motion to enforce the settlement agreement. They argued that the motion was "based in part on witness testimony in which there is a very real factual dispute," so they sought an opportunity to depose the defendants based on the allegations in their declarations. Pertinent to this appeal, they also argued that the payment of funds was contingent on execution of a separate agreement prepared by counsel, and they claimed that the parties still had not agreed upon such a separate agreement. They argued that there was no "meeting of the minds" on all material terms and that the parties' agreement referencing the execution of a separate agreement was in essence "an agreement to agree." They attached emails exchanged between the parties since the email agreement was sent on November 2. They also cited the following statements from Ms. Walker's deposition testimony:

"Well, this was an agreement to have our attorneys come up with their agreement."

"And by that, I meant the agreement that is drafted by both counsels, that we will agree what is in the agreement."

"Q. . . . The four corners of that e-mail, that document in your hand says that the Defendants will pay $75,000 in exchange for an agreement from the

- 3 -

parties to dismiss all of the lawsuits.  That's what it says; is that right?
A. Yes.  Once the counsel get together and come up with the agreement.  This is not the agreement, sir."

"Sir, with all due respect, I was depending on my counsel here to come up with the agreement."

Citing the parties' emails and deposition testimony, Ms. Walker and Walker & Associates contended that the parties each had a different understanding of what would be contained in the separate "Confidential Settlement Agreement" to be prepared by counsel.  They claimed that it was clear from Ms. Walker's emails and deposition testimony that she intended for the separate agreement to contain additional material terms that were discussed during the meetings.  They argued that the Confidential Settlement Agreement was itself "a material term of the email agreement, yet the terms of which were never agreed or consented to by the parties at the time of the email."  Ms. Walker and Walker & Associates contended that "at best the Parties made an agreement to a future agreement with separate terms not yet contemplated at the conclusion of the meetings between them." Thus, they characterized the email agreement as contingent on a future agreement that never came to fruition.

The trial court held a hearing on the motion on August 10, 2023.  Counsel for the defendants began by noting that the parties had already attended a full day of mediation before Ms. Walker requested that the parties meet without counsel at her house to try to resolve the case.  They argued that when the parties put their agreement into email form and signed it, that formed a binding and enforceable contract.  They suggested that Ms. Walker was simply trying to unilaterally add terms after-the-fact.  In response, Ms. Walker and Walker & Associates admitted that "if the agreement was we're going to pay Ceil Walker $75,000 and we are each going to dismiss the case and we are not going to talk about it, we wouldn't be here today because that would be a binding contract."  However, they reiterated their position that there was no meeting of the minds because they disagreed as to the substance of the separate Confidential Settlement Agreement to be prepared by counsel.  Their counsel acknowledged that "[o]ne would infer that it's going to be a confidentiality clause," but he insisted "that's not all there was."  Counsel suggested that the parties discussed whether Mrs. Heffington would return to work at Walker, and he argued "there were countless other terms that if called to testify she would tell you the other terms that they discussed that she believed, she believed were part of the agreement."  The defendants disagreed, insisting that the parties' agreement only consisted of the terms set forth in the email.  They explained, "Those terms are the parties, the amount, when it gets paid, the fact that a confidential agreement will be prepared, a mutual release, the claims will be dismissed with prejudice, and it will happen within three business days following payment."  The defendants asked the court to enter an order enforcing those terms of the email as a settlement agreement.  However, they noted that if the court ordered them to go back and work to enforce the agreement by building out other terms, they would do that

- 4 -

too.

The trial judge then announced her oral ruling, which was later incorporated into the court's final order.  At the outset, the trial judge noted that she had only heard from the defendants via their affidavits or declarations, and she had only seen excerpts of the deposition of Ms. Walker.  She stated that she had been wondering "what else was said" in Ms. Walker's deposition and whether the defendants had also been deposed "so that there could be some clarity as it related to exactly what was supposed to be in the confidential agreement."  Nevertheless, the trial judge announced that "this Court is going to enforce this agreement."  As for its terms, the trial judge explained that she could see, based on the email, that they entered into an agreement whereby the defendants were going to pay Walker & Associates $75,000 within 14 days of entering into a confidential settlement, "the terms of which that's what these parties need to continue to work out," there was going to be a mutual release by all parties, and the parties were going to dismiss their claims with prejudice.  Thus, she explained:

> [T]hose are the terms.  That a confidential agreement would be drafted and that all parties were to dismiss their claims with prejudice and there was a mutual release to be entered into and signed by all the parties and payment of $75,000 was to be done within 14 days.  That's what I find they agreed to.

The trial judge then stated again that "the Court was wondering what else did they agree to," and she said the question becomes whether the family could sit down and come up with the additional terms.  The judge stated that if she needed to conduct an evidentiary hearing on what was discussed she was willing to do that.  Still, however, she explained her conclusion that when Ms. Walker responded to that email saying she agreed and was glad to have her family back, the parties had come up with an acceptable agreement even if it was never put in the documents.  She stated that it was her intention to enforce the agreement because she believed one was made.

The trial court also entered a written order enforcing the settlement agreement.  It stated that the court had been presented with an email containing the subject line "Settlement Agreement Reached" and the parties' "agreed material settlement terms."  The order stated that the email "is an enforceable agreement."  The court found that the parties agreed to the following terms: the defendants agreed to pay Walker the lump sum provided within 14 days of execution of a separate confidential settlement agreement; all parties agreed to dismiss their claims with prejudice within 3 days following payment; and they agreed to execute a mutual release.  The order noted that the court's ruling granting the motion to enforce the settlement agreement "ends the underlying case."  The court ordered the parties to execute a separate confidential settlement agreement to be prepared by counsel.  However, if the parties could not agree on terms, the court ordered them to appear for an evidentiary hearing at which point the court would make findings and enter a separate order declaring the binding terms.  Ms. Walker and Walker & Associates filed a

- 5 -

notice of appeal. This Court entered a show cause order stating that the order appealed did not appear to be a final judgment because it directed the parties to execute a settlement agreement or appear for an evidentiary hearing, and the appellate record did not contain any separate confidential settlement agreement.

The trial court then held an evidentiary hearing on July 17, 2024. The trial judge explained that she still found that the email constituted an enforceable agreement, but she wanted to hear from the parties so that they could express "what they thought they agreed to and see if I hear anything that's common." Mrs. Cecilia Heffington was the first to testify. She explained that she and her husband received an email from her mother inviting them to her house to attempt to bring the family back together and end their "legal situation." She testified that the parties met there on three separate occasions, and each side brought agendas of topics they wanted to discuss. She said that at the end of the third meeting, they reached an agreement that was memorialized in the email. She explained that the parties all "signed" the email together. When asked what the terms of the agreement were, Mrs. Heffington stated, "Seventy-five thousand dollar payment to my mother to be executed within 14 days, and that we would all drop our cases against one another." When asked if any other specific terms were discussed as part of the agreement, Mrs. Heffington said, "No. We had to get the payment out of the way to get our relationship back on track." She explained that the payment was "the number one focus on how to move forward and how to get the attorneys out of this situation." Thus, according to Mrs. Heffington, "The understanding was we would make payment, we would dismiss our lawsuits, and we had a very, very long journey of therapy to even begin thinking about what the next phase of our relationship personally or professionally looked like." She conceded that, over the course of three days, the parties had talked about a lot of things that were not included in the email agreement. She testified that the parties were unable to sign the settlement agreement after their meetings because her mother refused.

Matthew Heffington testified next. He similarly testified that the parties met and discussed how they could resolve the lawsuit and counterclaim, and at the end of the third day, they came to an agreement. He testified that he authored the email confirming their settlement, and then Ms. Walker looked at it twice before the parties collectively agreed to send it to their attorneys. He explained that he typed it while they were all in the same room and that Ms. Walker did not modify the language at all or suggest that anything was wrong with it. To the contrary, he said she was absolutely in agreement with the terms and confirmed that again with her email in response. When asked about his understanding of the terms of the agreement, he explained, "We would drop all the cases between each other, pay her $75,000, and then potentially start therapy and hope to get the family back together." He noted, however, that the last topic regarding therapy was "[n]ot at all" a requirement of their agreement.

Mr. Heffington testified that the parties had been unable to sign a settlement and release since that final meeting. He acknowledged an email he sent in the week after their

meeting in which he wrote, "Dearest mother-in-law, let's keep this on track. That's our goal as well. We collectively agreed that we need to get a settlement in place to drop the lawsuits before we could begin to weigh in to the details about how the LLC would operate going forward . . . ." Mr. Heffington testified that the parties already had an agreement in place in the form of the settlement email. He explained that the issue regarding how the LLC would operate going forward "was not part of the agreement." He explained that the parties discussed a lot of things during their meetings over the course of three days, including "everything from the weather to Titans football." However, he insisted that their agreement was solely with regard to "what I put in the email." He added, "There were a number of things we needed to work on as a family, but that would come after if she followed through with what we agreed to." In another email, Mr. Heffington had stated that he and his wife would commit to meeting again and "working through those details . . . once these lawsuits have been dismissed." He testified that the "details" they were discussing were with respect to family therapy.

Finally, the trial court heard testimony from Ms. Walker. The trial judge reiterated that she was "standing firm" on her prior ruling regarding the enforceability of the agreement, but she was just trying to allow Ms. Walker and Walker & Associates to have an opportunity to put on proof "so that they can have their day in court." Ms. Walker testified that she had requested that the parties have direct meetings without their attorneys in order to try and reach some kind of resolution of the case. She said she requested that negotiations occur in this way because the parties themselves "really were not talking," and she thought "we could make headway and get these things resolved and come to a conclusion and move forward in our family life." She explained that she had prepared an agenda with topics she wanted to discuss, which included "getting the family back together," protecting her husband's legacy, damages, payment of legal expenses, and future communication. Ms. Walker testified that she would not have made an agreement "to dispose of things that did not involve addressing the family issues." She admitted that in response to Mr. Heffington's email, she wrote, "I agree. Happy to have my Family back together!!!!" Still, Ms. Walker testified that she believed the Confidential Settlement Agreement executed by their counsel "would address these agenda items that we talked about," including getting the family back together, whether the LLC would be dissolved, whether its clients would be rolled back into the company, if the parties would start working together again, and whether there was a path for Mrs. Heffington to become president of the company. Ms. Walker was asked, "When you said 'I agree' in that email, did you think all of these things were included in your agreement?" She responded, "No." She believed that "our counsels will work out the agreement details." Thus, Ms. Walker took the position that "[i]t was an agreement that we were working on that our counsels were going to formulate the agreement and neither party was going to sign an agreement unless it had everything in there that we agreed in." She said, "I believe that the documents that were being prepared by both counsels would include what I believed and [as] well as they had things they wanted to put in that they agreed that we never even discussed." When asked if she could identify a single additional contract term that all parties had agreed on, she

initially said "[t]here's lots of them" but when pressed further said "I don't know." She again stated that she believed the separate confidential settlement agreement would address a wide range of issues, including whether Mrs. Heffington would wind down her LLC and "wind it back into" Walker, whether she would return to work at Walker, figuring out what the total damages were and legal expenses. Thus, according to Ms. Walker, at the conclusion of that third meeting, "there were still other terms that had to be worked out" that the parties had not agreed on, and "that was what the attorneys were going to do."

In closing arguments, counsel for the defendants asked the court to consider the caption of the email stating, "Settlement Agreement Reached." He claimed that the execution of a more formal document by counsel was a mere formality, not a call for the attorneys to negotiate all the material terms of an agreement. Counsel argued that the parties had agreed to dismissal of the lawsuit upon the payment of $75,000, and Ms. Walker admitted that there was no meeting of the minds on any other term. He suggested that Ms. Walker simply had "a list of things she's sorry she didn't include when she did agree." He also suggested that no one would agree to accept $75,000 for dismissal of a lawsuit and then say the most important terms of the agreement had not been reached. He characterized this as "buyer's remorse." In response, Ms. Walker and Walker & Associates argued that the email called for execution of a separate agreement, so it was essentially an unenforceable "agreement to agree." They argued that there was no settlement on the material terms of the agreement and that issues remained to be negotiated.

On July 17, 2024, the trial court entered a final order enforcing the settlement agreement and dismissing all claims with prejudice. The court again found that the email contained the subject line "Settlement Agreement Reached" and contained the parties' "agreed material settlement terms." The court again found that this was an enforceable agreement. The court found that the parties agreed to the following terms: the defendants agreed to pay Ms. Walker $75,000 within 14 days of execution of a separate confidential settlement agreement; all parties agreed to dismiss their claims with prejudice within 3 days of payment; and they agreed to execute a mutual release. The court accepted these agreed terms as the binding terms of an enforceable settlement agreement. Therefore, it ordered the defendants to pay $75,000 within fourteen days of the order, and all claims would be dismissed, as the parties had mutually released their claims.

## II.   ISSUES PRESENTED

Ms. Walker and Walker & Associates (collectively, "Ms. Walker") present the following issues for review on appeal:

1.   The electronic message communication sent by Mr. Matthew Heffington on 2 November 2022 is not an enforceable settlement agreement, and the parties did not reach an enforceable settlement.

2.   An electronic mail communication between represented parties to a

lawsuit containing some terms and making explicit reference to an agreement to be drafted by the attorneys for both parties is an agreement to agree, and is not enforceable as a settlement agreement.

3. The order entered on July 17, 2024, does not reflect the trial court's independent judgment that the terms of the settlement agreement had not been "hashed out."

For the following reasons, we affirm the decision of the trial court.[2]

## III. DISCUSSION

"A settlement agreement made during the course of litigation is a contract between the parties, and as such, contract law governs disputes concerning the formation, construction, and enforceability of the settlement agreement." *Waddle v. Elrod*, 367 S.W.3d 217, 222 (Tenn. 2012). As the Tennessee Supreme Court recently explained,

> Whether a valid contract exists is a question of law. *German v. Ford*, 300 S.W.3d 692, 701 (Tenn. Ct. App. 2009) (citing *Murray v. Tenn. Farmers Assurance Co.*, No M2008-00115-COA-R3-CV, 2008 WL 3452410, at *2 (Tenn. Ct. App. Aug. 12, 2008)). Interpretation of a contract and a determination of the parties' intentions related to the contract are also questions of law. *Guiliano v. Cleo, Inc.*, 995 S.W.2d 88, 95 (Tenn. 1999). Accordingly, "the trial court's decisions relating to contract formation and its interpretation of the contract are not afforded a presumption of correctness." *German*, 300 S.W.3d at 702.

*Pharma Conf. Educ., Inc. v. State*, 703 S.W.3d 305, 311 (Tenn. 2024). In another recent case, our Supreme Court set forth the following principles regarding Tennessee's approach to contract interpretation:

> Looking at the broad range of Tennessee contracts cases, it is clear that Tennessee courts have sought, albeit imperfectly, to achieve balance in contract interpretation. The central principle endures, to interpret contracts so as to ascertain and give effect to the intent of the contracting parties. *See, e.g.*, *Wallis* [*v. Brainerd Baptist Church*, 509 S.W.3d 886, 899 (Tenn. 2016)]; *Dick Broadcasting* [*Co. of Tennessee v. Oak Ridge FM, Inc.*, 395 S.W.3d 653, 659 (Tenn. 2013)]; *Clark* [*v. Sputniks, LLC*, 368 S.W.3d 431, 441 (Tenn. 2012)]; *Allmand* [*v. Pavletic*, 292 S.W.3d 618, 630 (Tenn. 2009)]. In effectuating this principle, our courts have noted that judges "are entitled to

---

[2] We note that neither party raised any issue regarding the parol evidence rule. Thus, we do not discuss it in this appeal. *See Rhea v. Marko Const. Co.*, 652 S.W.2d 332, 333-34 (Tenn. 1983) ("[A]ppellees contend that this testimony violated the parol evidence rule. The record contains no indication that there was any objection made to it, however, so that that question is not properly before us.")

place themselves in the same situation as the parties who made the contract, so as to view the circumstances as they viewed them, and so as to judge of the meaning of the words and of the correct application of the language to the things described." *Staub* [*v. Hampton*, 101 S.W. 776, 785 (Tenn. 1907)] (quoting *Nash* [*v. Towne*, 72 U.S. 689 (1866)]); *see also Ashley v. Volz*, 218 Tenn. 420, 404 S.W.2d 239, 242 (1966). Courts should not be "shut out from the same light which the parties enjoyed when the contract was executed." *Staub*, 101 S.W. at 785 . . . .

However, the strong strain of textualism in Tennessee caselaw demonstrates resolve to keep the written words as the lodestar of contract interpretation. *See, e.g.*, *Planters Gin Co.* [*v. Fed. Compress & Warehouse Co.*, 78 S.W.3d 885, 889-90 (Tenn. 2002)]; *Guiliano* [*v. Cleo, Inc.*, 995 S.W.2d 88, 95 (Tenn. 1999)]; *Bob Pearsall Motors, Inc.* [*v. Regal Chrysler-Plymouth, Inc.*, 521 S.W.2d 578, 580 (Tenn. 1975)]; *Empress Health & Beauty Spa, Inc.* [*v. Turner*, 503 S.W.2d 188, 190 (Tenn. 1973)]; *City of Cookeville ex rel. Cookeville Reg'l Med. Ctr.* [*v. Humphrey*, 126 S.W.3d 897, 903 (Tenn. 2004)]. Tennessee has rejected firmly any notion that courts are a fallback mechanism for parties to use to "make a new contract" if their written contract purportedly fails to serve their "true" intentions. See *Petty* [*v. Sloan*, 277 S.W.2d 355, 359 (Tenn. 1955)]; *Smithart* [*v. John Hancock Mut. Life Ins. Co.*, 71 S.W.2d 1059, 1063 (Tenn. 1934)]. Tennessee courts "give primacy to the contract terms, because the words are the most reliable indicator—and the best evidence—of the parties' agreement when relations were harmonious, and where the parties were not jockeying for advantage in a contract dispute." [Steven W. Feldman, 21 Tenn. Practice: Contract Law and Practice § 8:14 (June 2018)].

*Individual Healthcare Specialists, Inc. v. BlueCross BlueShield of Tenn., Inc.*, 566 S.W.3d 671, 694 (Tenn. 2019).

On appeal, Ms. Walker argues that the plain language of the email and the context of the parties' circumstances "show only an 'agreement to agree,'" so no enforceable agreement exists. She argues that the intention of the parties must govern the analysis of mutual assent, and "courts judge intention by the objective meaning of the words used and the context of the agreement." Ms. Walker claims that a writing asserted to be a settlement "must show present mutual assent to terms actually included in the document." She contends that the objective and plain meaning of this email shows that it was a mere "agreement to agree" to a more comprehensive agreement in the future, rather than a definite and enforceable obligation in itself. Ms. Walker claims that the payment was contingent on "execution of an agreement left to future negotiation and preparation." In her view, the email "simply agreed for a subsequent agreement whose terms were not defined to be prepared by the parties' attorneys." She claims the email was a mere "initial exchange that specifically calls for their lawyers to draft a 'settlement agreement' in the

context of having discussed a large number of issues."

"The judiciary encourages parties to work amicably to settle legal disputes outside the court system." *Henderson v. Dwayne*, No. M2024-00270-COA-R3-CV, 2025 WL 658788, at *6 (Tenn. Ct. App. Feb. 27, 2025) (citing *Harbour v. Brown for Ulrich*, 732 S.W.2d 598, 599 (Tenn. 1987); *Lovelace v. Copley*, 418 S.W.3d 1, 29 (Tenn. 2013)). "Our courts 'retain the inherent power to enforce agreements entered into in settlement of litigation pending before them,' and this power exists 'even if the parties' agreement has not been reduced to writing.'" *Hayes v. Extreme Excavation, LLC*, No. E2023-01435-COA-R3-CV, 2024 WL 4375003, at *3 (Tenn. Ct. App. Oct. 2, 2024) *perm. app. denied* (Tenn. Mar. 13, 2025) (quoting *Anglo-Danish Fibre Inds., Ltd. v. Columbian Rope Co.*, No. 01-2133 GV, 2002 WL 1784490, at *3 (W.D. Tenn. June 21, 2002)).

In this context, "[t]here is a 'meeting of the minds' when the parties are in mutual assent to the terms." *Thompson v. Moody*, No. W2024-01225-COA-R3-CV, 2025 WL 355055, at *2 (Tenn. Ct. App. Jan. 31, 2025) (quoting *In re Estate of Josephson*, No. M2011-01792-COA-R3-CV, 2012 WL 3984613, at *2 (Tenn. Ct. App. Sept. 11, 2012)). "In determining mutuality of assent, courts must apply an objective standard based upon the parties' manifestations." *Staubach Retail Servs.-Se., LLC v. H.G. Hill Realty Co.*, 160 S.W.3d 521, 524 (Tenn. 2005). "We examine 'the parties' objective manifestations, not their secret intentions,' for the presence of assent." *Am. Bd. of Craniofacial Pain v. Am. Bd. of Orofacial Pain*, 633 S.W.3d 598, 602 (Tenn. Ct. App. 2020) (quoting 1 Williston on Contracts § 3:4 (4th ed., Westlaw (database updated Nov. 2020)). Thus, "[w]hether mutual assent has occurred must be determined not only from the words in the contract but also from 'the situation, acts, and the conduct of the parties, and the attendant circumstances.'" *Grace v. Grace*, No. W2016-00650-COA-R3-CV, 2016 WL 6958887, at *3 (Tenn. Ct. App. Nov. 29, 2016) (citing *McMahan v. McMahan*, No. E2004-03032-COA-R3-CV, 2005 WL 3287475, at *5 (Tenn. Ct. App. Dec. 5, 2005)).

Here, after meeting for seven hours over the course of three days, the parties signed an email with the subject "Settlement Agreement Reached," which stated:

> Between Ceil Walker and Walker & Associates, Inc. ("Walker") and Matthew Hef[f]ington, Cecilia Heffington, and Cecilia Lona, LLC ("Defendants") (collectively with Walker, the "Parties").
>
> Defendants to pay Walker lump sum of $75,000 within 14 days of execution of separate Confidential Settlement Agreement to be prepared by counsel for the Parties.
>
> Mutual release by all Parties.
>
> All Parties to dismiss their claims with prejudice within three business days

following payment.

> /s/ Matthew Heffington
> /s/ Cecilia Lona Walker Heffington
> /s/ Ceil Walker

Ms. Walker responded with the following statement: "I agree. Happy to have my Family back together!!!!" Thus, it is clear that the parties' negotiations culminated in mutual assent by all parties to these material terms of the settlement. The very subject of the email states "Settlement Agreement Reached." Thus, we conclude that the parties contemplated that a separate Confidential Settlement Agreement would be drafted by their attorneys to memorialize their agreement, as more formal documentation, but the agreement was already made. We simply cannot read the parties' email to objectively suggest in any way that the attorneys would attempt to negotiate and reach some separate comprehensive agreement on a wide variety of issues that the parties may or may not have even discussed.

As we explained in *American Board of Craniofacial Pain*, 633 S.W.3d at 603:

> Although the parties may have intended to memorialize their agreement with a memorandum of understanding, [they] could have reached an enforceable contract without one. *See* Restatement (Second) of Contracts § 27 (Am. Law Inst. 1981) ("Manifestations of assent that are in themselves sufficient to conclude a contract will not be prevented from so operating by the fact that the parties also manifest an intention to prepare and adopt a written memorial thereof."). After all, "[p]arties who plan to make a final written instrument as the expression of their contract necessarily discuss the proposed terms of the contract before they enter into it and often, before the final writing is made, agree upon all the terms which they plan to incorporate [in the written instrument]." *Id.* § 27 cmt. a. So parties, either orally or through the exchange of writings such as emails, can form a binding contract that includes an obligation to sign a final writing that incorporates all agreed-upon terms. *Id.* To be binding, the parties must agree "'on all essential terms that are to be incorporated in the [final writing,]'" and the final writing must be "'understood to be a mere memorial of the agreement already reached.'" *EnGenius Entm't, Inc. v. Herenton*, 971 S.W.2d 12, 17 (Tenn. Ct. App. 1997) (quoting 1 Arthur L. Corbin et al., Corbin on Contracts § 2.8, at 133-34 (Rev. ed. 1993)). There is no binding contract "if either party knows or has reason to know that the other party regards the agreement as incomplete and intends that no obligation shall exist until other terms are assented to or until the whole has been reduced to another written form." Restatement (Second) of Contracts § 27 cmt. b.

"The 'expression of the parties' intent to be bound[ ] and the definitiveness with which

they state their terms' are related concepts." *Id.* at 604 (citing *Huber v. Calloway*, No. M2005-00897-COA-R3-CV, 2007 WL 2089753, at *3 (Tenn. Ct. App. July 12, 2007)).

In the parties' email agreement in this case, they indicate that "express agreement had been reached on all the terms to be included" in the settlement, and the parties' conduct thereafter also suggests a complete agreement. *See id.* at 604. They expressed their intent to be presently bound not only by signing each of their names at the bottom and sending it to their attorneys, but also by Ms. Walker's reply, "I agree. Happy to have my Family back together!!!!" Thus, there is nothing in the record to show that Mr. and Mrs. Heffington knew or had reason to know that Ms. Walker regarded the agreement as incomplete and intended that no obligation would exist until other terms were assented to or until the whole was reduced to another written form. *See id.* at 603; *see also PNC Multifamily Cap. Institutional Fund XXVI Ltd. P'ship v. Mabry*, 402 S.W.3d 654, 661-63 (Tenn. Ct. App. 2012) (explaining that the fact that one party "refused to execute more formal documentation, does not, *ipso facto*, negate the trial court's ruling that a valid and enforceable settlement was, nonetheless, reached in this case"); *Probst v. Liberty Mut. Grp., Inc.*, No. M2022-01477-COA-R3-CV, 2024 WL 774668, at *6-7 (Tenn. Ct. App. Feb. 26, 2024) ("As the trial court correctly found after hearing arguments from the parties on the motion to enforce the settlement agreement, '[T]here was an agreement here. No proof to the contrary. Their nonsignature notwithstanding. That e-mail chain is specific and explicit, and without counterproof in this circumstance represents to the Court's mind offer acceptance and all material terms necessary for agreement by an agent of the plaintiffs, their then-counsel.' For the foregoing reasons, we affirm the trial court in its determination that the March 17 written settlement agreement is enforceable.").

This Court considered several arguments similar to those presented here in *Harvey v. Turner*, No. M2014-00368-COA-R3-CV, 2015 WL 1451702, at *1 (Tenn. Ct. App. Mar. 26, 2015) *perm. app. denied* (Tenn. Aug. 14, 2015), where parties announced the essential terms of a settlement in court but failed to agree to a written settlement document thereafter. One party "felt that there was supposed to be mention of a sewer line in the agreement." *Id.* at *2. The trial court disagreed, concluding that "[w]hat was announced to the Court . . . was a settlement," "the essential terms are there," and if it was not announced in court then "it's not part of the settlement." *Id.* The trial court reasoned that "there was a meeting of the minds and that that issue was not part of it." *Id.*

On appeal, the appellant argued that the purported settlement was unenforceable because "the parties expected a more formal settlement agreement to be drafted and executed." *Id.* He claimed that their "agreement in principle" was "simply an unenforceable agreement to agree." *Id.* He also insisted that "[t]he formal, written settlement agreement . . . was necessary to create a binding agreement." *Id.* We recognized that "absent mutual assent to the essential terms of a claimed settlement agreement, the agreement cannot be enforceable." *Id.* (quoting *Petersen v. Genesis Learning Centers*, No. M2004-01503-COA-R3-CV, 2005 WL 3416303, at *4 (Tenn. Ct. App. Dec. 13, 2005)).

However, we explained that "[t]he best place to begin is with the words actually said in court." *Id.* at *3. The parties' attorneys had announced that they had reached an agreement in principle resolving the claims but a "more formal settlement agreement which contains the essential terms of the documents exchanged between the parties will be executed and will include confidentiality provisions." *Id.* We rejected the argument that the in-court announcement was "nothing more than an agreement to agree." *Id.* We explained that agreements to agree "are unenforceable in Tennessee because their terms are indefinite." *Id.* However, the conditions at issue did not make the terms indefinite or "make the settlement an agreement to agree." *Id.* We also rejected his argument that "the fact that a formal settlement document was contemplated indicates that the settlement announced in court was not intended to be binding." *Id.* We explained that one of the factors courts rely on in determining "the intent behind a 'preliminary' agreement is its completeness." *Id.* If it contains the essential terms of the transaction, "it indicates that the parties intended to be bound to consummate the transaction." *Id.* We found the agreement announced in court was quite detailed and described by the attorneys as the essential terms of the settlement that they would set forth in the transcript, from which they could work "in order to do a comprehensive release." *Id.* at *4. Finally, we explained that the appellant's desire to include language regarding the sewer line was "not material to whether a settlement contract was created." *Id.* We explained that whether a meeting of the minds occurred was a question of fact, and the trial court's finding that there was a meeting of the minds as to the essential terms of the settlement was consistent with the preponderance of the evidence. *Id.* at *6.

We also find this case comparable to *Hayes v. Extreme Excavation*, wherein this Court concluded that "communications between the parties' attorneys contained all the material terms of the settlement, making the correspondence an enforceable contract," as they agreed that "Mr. Hayes would pay Extreme Excavation $25,000; the parties would execute a written settlement agreement and release; each party would bear their own attorney fees and discretionary costs; and Mr. Hayes would pay court costs." 2024 WL 4375003, at *3. It did not matter that one of the attorneys, after conveying his client's agreement, had stated that he was going out of town and "we can finalize the settlement when I return." *Id.* at *2. We explained, "Despite Mr. Hayes's attorney's statement about future finalization of the settlement, the essential terms were already finalized. The only step remaining was for the parties to put their agreement in writing and sign the agreement[.]" *Id.* at *4. This was not a required step for a determination that a contract had already been formed. *Id.*

Ms. Walker also argues on appeal that the trial court's own findings show that no enforceable agreement was reached because, in Ms. Walker's words, "additional unknown terms existed." We note that Ms. Walker's own position regarding the existence of additional terms has changed over the course of this lawsuit. She filed a response to the motion to enforce the settlement agreement, arguing that "at best the Parties made an agreement to a future agreement with separate terms not yet contemplated at the conclusion

of the meetings between them." During the hearing, however, her counsel argued that "there were countless other terms that if called to testify she would tell you the other terms that they discussed that she believed, she believed were part of the agreement." At the conclusion of that first hearing, the trial judge announced that she found the email to be an enforceable agreement. She explained:

> [T]hose are the terms. That a confidential agreement would be drafted and that all parties were to dismiss their claims with prejudice and there was a mutual release to be entered into and signed by all the parties and payment of $75,000 was to be done within 14 days. That's what I find they agreed to.

However, the trial judge noted that she had only limited evidence before her and admittedly "was wondering what else did they agree to." She ultimately conducted an evidentiary hearing and gave the parties an opportunity to testify and "have their day in court." At the end of the evidentiary hearing, however, the trial judge made the following comments:

> What I found, or what I held August the 10th, was that the parties had come up with an agreement, the specific terms of which today after having an evidentiary hearing I realized were not necessarily hashed out.
> But I gave the parties a road map as it related to those things that the email outlined that I did say was in effect the agreement. And that was, one, a $75,000 payment would be made within 14 days but here's the catch of them actually executing a confidential settlement agreement.
> . . . .
> The easiest way for The Court to get a final order entered and still hold firm to my ruling in August of 2023, is for me to enter an order that outlines that this case will be dismissed; that the parties have a mutual release of all claims as it relates to this particular case.
> And then any other counseling, family counseling, therapy, whether or not there's a merger between Cecilia Lona LLC and Walker & Associates to preserve the legacy of Mr. Walker, all of those other terms that they discussed but did not actually have the specifics solidified enough to put in an agreement, I cannot and will not try to -- I can't create that contract for the parties.
> And The Court – that's not The Court's job to create that contract. So I will sign this final order enforcing settlement and dismissing claims with -- I don't know. Did they agree to dismiss claims with prejudice or without prejudice?

> MR. HANCOCK: They did with prejudice, Your Honor. That's one of the things they agreed.

> THE COURT: Let me look at the email. Yep. With prejudice.

- 15 -

Ms. Walker argues that within these comments, "the trial court specifically found the absence of terms of an agreement, a failure to include all of the terms of an agreement in the electronic mail communication, and the existence of an 'agreement to agree.'" We disagree. Although not a model of clarity, looking at this explanation as a whole, it is clear that the trial court found that the parties reached an enforceable agreement on the terms contained within the email, and there was no agreement to any *additional* terms. Notably, the trial court's final order did not incorporate by reference the transcript of the hearing, so these comments by the trial judge were not adopted in the final order. "'[T]he court speaks through its order, not through the transcript.'" *In re Rufus C.*, 660 S.W.3d 725, 742 (Tenn. Ct. App. 2022) (quoting *In re Adoption of E.N.R.*, 42 S.W.3d 26, 31 (Tenn. 2001)). The written order simply found that the email was an enforceable agreement, as it contained the subject line "Settlement Agreement Reached" along with "the parties' agreed material settlement terms." The court found that the parties agreed to the payment of $75,000 within 14 days of execution of a separate confidential settlement agreement, the claims would be dismissed with prejudice, and there would be a mutual release. The court found that these were the agreed and binding terms of the enforceable settlement agreement.

Ms. Walker also suggests that "given the variation" between the statements from the bench and the final order, "the order of 17 July 2024, does not appear to reflect the independent judgment of the trial court," citing *Smith v. UHS of Lakeside, Inc.*, 439 S.W.3d 303, 316 (Tenn. 2014). We disagree. The order accurately reflects the decision of the trial court, and the record does not create doubt that the decision reviewed and signed by the court represents the court's own deliberations and decision. *See id.*; *see also Black v. Baldwin*, No. M2024-00151-COA-R3-CV, 2025 WL 1566392, at *3-4 (Tenn. Ct. App. June 3, 2025) *perm. app. denied* (Tenn. Oct. 8, 2025).

## IV. CONCLUSION

For the aforementioned reasons, the decision of the chancery court is hereby affirmed. Costs of this appeal are taxed to the appellants, Walker & Associates, Inc., and Ceil Walker, for which execution may issue if necessary.

s/ Carma Dennis McGee
CARMA DENNIS MCGEE, JUDGE

- 16 -